762 So.2d 662 (2000)
STATE of Louisiana
v.
Yvonne M. CARTER a/k/a Yvette Scott.
No. 97-KA-2902.
Court of Appeal of Louisiana, Fourth Circuit.
May 10, 2000.
*666 Harry F. Connick, District Attorney of Orleans Parish, Nicole Barron, Assistant District Attorney of Orleans Parish, New Orleans, LA, Attorneys for Plaintiff/Appellee.
Sheila C. Myers, New Orleans, LA, Attorney for Defendant/Appellant.
(Court composed of Chief Judge ROBERT J. KLEES, Judge MIRIAM G. WALTZER, Judge JAMES F. McKAY, III).
McKAY, Judge.

STATEMENT OF THE CASE
The defendant Yvette Scott was charged by grand jury indictment on January 27, 1994 with the second degree murder of Roger Scott, in violation of La. R.S. 14:30.1. The defendant pleaded not guilty and not guilty by reasons of insanity at her February 2, 1994 arraignment. The trial court found the defendant competent to proceed at a March 1, 1994 lunacy hearing. The trial court denied the defendant's motions *667 to quash and to suppress the statement on March 30, 1994. On September 23, 1996, the defendant changed her plea to not guilty. Following trial by a twelve-person jury, the defendant was found guilty of manslaughter. On September 3, 1997, the trial court denied the defendant's motion for a new trial. After waiving all delays, the defendant was sentenced to serve twenty-one years at hard labor, with sixteen years suspended, and five years active probation. The trial court denied the defendant's motion for reconsideration of sentence and granted the defendant's motion for appeal on September 3, 1997.

FACTS
New Orleans Police Officer Terrell Seiber testified that on November 21, 1993, at approximately 4:15 a.m., he and his partner, Officer Tyrone Mills, arrived on the scene of an aggravated battery by shooting at the Bottom Line Lounge, located at 2101 N. Claiborne Avenue. The victim, later identified as Roger Scott, was lying on the sidewalk in a pool of blood. Officer Seiber placed the defendant-the victim's wife-in his police vehicle. Officer Seiber said the defendant was crying and upset and that he detected a mild odor of alcohol coming from the back of the vehicle. He also said that said he did not observe any injuries on defendant at that time. He subsequently transported the defendant to the homicide bureau, where she was interviewed, then transported her to Central Lockup. Officer Seiber was present at the homicide office and said that he did not observe any injuries to the defendant at either the crime scene or the homicide office.
Orleans Parish Coroner's Office pathologist Dr. Paul McGarry was qualified by stipulation as an expert in the field of forensic pathology. Dr. McGarry testified that his autopsy of the victim revealed a single gunshot wound that went through the front of his upper right arm and into his chest, perforating his right lung and causing massive disruption of the tissue opening of the right lung and bronchus, massive hemorrhaging, and, ultimately, death. Dr. McGarry identified a nine-millimeter bullet, which he found resting against the victim's spine. There was a cluster of fresh markings"scuff marks"on the back of the victims' right hand. There was no evidence of injury to the hard parts of the hands, the wrists, or elbows. However, Dr. McGarry said that if the skin is hard, it is possible that a person could hit something with his knuckles and not bruise. Dr. McGarry stated that, based on the bullet track, it was his opinion that at the time the victim was shot he could have been either tilting his body to get into a vehicle or could have been in the vehicle tilting his body to reach out for something, as opposed to sitting in the vehicle with his hands on the steering wheel. Dr. McGarry stated on cross-examination that tests showed that the victim's blood alcohol content was .14 percent, which is over the legal limit. Dr. McGarry said the victim was six feet tall and weighed two hundred and twenty pounds. He further testified that the victim had no narcotics or other drugs in his system.
New Orleans Police Department Crime Lab technician Officer Carl Palmer testified that he photographed the crime scene, collected evidence there, and made a sketch of the scene. He identified a .380 caliber semiautomatic pistol, a spent .380 caliber casing, and a key ring with two Ford vehicle keys on it. On cross-examination, he said that there had been other bullets in the gun, but that only one had been fired. Officer Palmer stated that he had not recovered a key ring with thirteen keys on it, identified as a defense exhibit, from the scene.
New Orleans Police Officer Christopher Joseph Smith Sr. testified that he was working a uniformed paid detail at the Bottom Line Lounge on the morning of November 21, 1993. He said he saw the victim sitting alone on the second floor of the bar sometime before midnight. He later observed the defendant enter the bar and go upstairs. Officer Smith testified *668 that as the couple came downstairs to leave, the defendant was walking behind the victim "fussing" at him, apparently engaged in a "one-sided" argument with the victim. He said the victim did not hit the defendant nor lay his hands on her at any time. Prior to the couple leaving, the officer had not been informed of any disturbance involving the two of them. Approximately one hour after that, he and another officer on detail, Officer Gregory Clay, were in front of the bar when Officer Smith noticed a Ford Explorer parked nearby with a red or maroon Camaro parked behind it. He did not see the defendant or the victim. A few minutes later, after he and Officer Clay had gone back inside, people came running through the front door saying that the defendant had shot the victim. Officer Smith went outside and found the victim lying in a pool of blood, with a gun approximately five feet from his body. He said the defendant was upset and crying, and pacing back and forth near the body. Officer Smith said the defendant told him a young man had attempted to rob her and the victim. He observed that the window of the Explorer had been shot out and that there was blood inside the vehicle. He said that he did not notice any injuries to the victim.
New Orleans Police Officer Gregory Clay was working the same detail as Officer Smith on the night of the murder. He was primarily roaming the interior three floors of the bar, while Officer Smith was working inside the front door. Officer Clay said he did not see either the defendant or the victim prior to the shooting, and had not been made aware of any altercations in the interior of the bar involving them. Immediately prior to the shooting, he and Officer Smith had cleared the outside area of loiterers. When they were advised of the shooting Officer Clay went outside and saw the victim lying on the ground in pool of blood, and mumbling something to the effect that, "She shot me." He observed the defendant frantically pacing up and down, and she told him that she had been in the vehicle when someone attempted to rob her, and that the person shot the victim through the window. Officer Clay said he looked into the vehicle and noticed a foil-wrapped plate on the passenger seat, causing him to doubt the defendant's story that she had been inside the vehicle. Officer Clay identified photographs of the scene. He said the defendant did not make any statements alleging that she had been attacked or abused by the victim, and he did not notice any injuries to the victim. On cross-examination, Officer Clay said that, due to the loud music, it was possible that people could have argued in the bar and he would not have heard it.
New Orleans Police Homicide Detective Norman McCord responded to the homicide outside the Bottom Line Lounge on November 21, 1993. He said all the doors of the Explorer were locked except for the driver's side. There was a bullet hole in the passenger window with a bevel on the inside, indicating that the bullet traveled from the outside inward. He found a stainless steel and black-colored semiautomatic 9mm "short" caliber pistol lying on the ground with the safety off and the hammer cocked. Det. McCord said he later spoke with the defendant at the homicide office, after first advising her of her rights. The defendant indicated that she understood those rights, and gave two versions of the events leading up to the death of her husband. The defendant first stated that two black males had approached her outside the vehicle after the victim had already entered, attempted to take her purse, and shot the victim while he was seated in the vehicle. Her second statement was that while still inside of the bar, an unknown black male bumped into her and words were exchanged. She and the victim then left the bar. Once outside, the victim asked for the gun she had in her purse. The defendant gave him the gun, which was the one found at the scene. The victim then entered the driver's side of the vehicle. As she was standing by the passenger door the same unknown black *669 male who had bumped into her attempted to take her purse shot the victim. Det. McCord said the victim never made any statement regarding another gun being on the scene. Det. McCord said a cellular telephone was sitting on top of blood that was on the driver's seat. He said he found no weapon in the vehicle, nor any hidden compartment. Det. McCord stated that he got a good look at the defendant while in the homicide office, and that she had a small hickey on her left cheek. The defendant explained that she had hit her cheek on the truck while getting into it. He did not see any other injuries on defendant. The defendant did not make any statements alleging that the victim had abused her, hit her, or struck her in any way.
On cross-examination, Det. McCord said his search of the vehicle might not be reflected in his report, since he did not find anything. He stated that the dashboard of the vehicle was intact and undamaged at the scene. Det. McCord admitted that when he first noticed the small hickey on the defendant's face, he thought there may have been domestic abuse involved in the situation, and he further admitted that it "absolutely" would have affected the situation and made a difference in his mind. He said once the defendant told him that she hit her head on the door of the truck he did not question her about the hickey being the result of abuse. Det. McCord did not move the defendant's hair to the side, or request that she be examined for any signs of injury. When asked whether he found any evidence of the victim's propensity for violence, Det. McCord replied that he discovered that the victim had a criminal record.
On redirect examination, Det. McCord stated that he gave the defendant an opportunity to fully explain the circumstances of the shooting, and asked if she wished to give a formal statement. The defendant said she did not, and requested to speak with an attorney.
It was stipulated that if New Orleans Police Officer Kenneth Leary would testify, he would be qualified as an expert in the field of firearms identification, and would testify that the bullet recovered from the victim, and the casing found at the scene, were fired and ejected from the firearm recovered at the scene, i.e., the firearm recovered at the scene was the murder weapon.
Patricia Anders, the victim's sister, testified that the victim and the defendant were married on February 14, 1993, but had lived with each other altogether for three or four years. She said the victim and the defendant had two children, the second one having been born just three weeks prior to his death. She testified that the victim was known by the nickname of "Tip," a name he got as a young boy because he was "easygoing." She denied that the victim ever went by the nickname of "Big Time Tip," although she admitted that a former friend of his had named a bar "Big Time Tip's" in honor of her brother. Ms. Anders said defendant telephoned her in early January, after the shooting, and began crying and telling her that the victim had beaten her, and that Ms. Anders just did not understand. Ms. Anders asked the defendant if the victim was beating her when she came out of the bar or when he got into his truck. She said the defendant, who was still crying, stated, "He was going to leave me." Ms. Anders said she heard a voice in the background say, "No, don't' say that." She said the defendant had never mentioned to her that the victim was abusive to her, and that she had never seen any abusive behavior or any physical evidence of abuse. On cross-examination, Ms. Anders admitted that the victim had been making the mortgage payments on her house while she was in law school at Southern University in Baton Rouge.
The defendant, who was thirty-three years old at the time of trial, testified that she had a high school education with some training in data entry and as a nurse's assistant. She had four children, ages fifteen, eleven, seven and three; the younger *670 two being the victim's children. She met Roger Scott, the victim, on October 8, 1988, her birthday. She said his nickname was "Tip," and that he later became known as "Big Time Tip." Roger Scott was eleven and one-half years older than the defendant. She said when she was pregnant with the first of their two children, the victim threw a garbage can at her. After the birth of their first child, Sharmoniqua, a female telephoned the defendant's house and she confronted the victim about it. She said that in response, he kicked her in her vagina. When she threatened to call the police, she said the victim said he hated police, and that if she ever told them what he did to her he would kill her like he had killed a man who begged for his life. She said the victim still came over after that, bringing her Pampers and seeking to have sexual relations with her in exchange for cocaine. The defendant said she began using cocaine when the victim began "feeding" it to her everyday. She eventually entered a substance abuse program for thirty-seven days, remaining in aftercare for an additional three months while living with her parents. The victim took her to Atlanta, Georgia on a bus once. When they got to the hotel the victim wanted to have sex, but the defendant said she was tired. She said the victim punched her in the nose, leaving her with two black eyes. Some other people on the trip with them took a photograph of the defendant, which she identified as evidence. She stated that after later moving in with the victim, she found a motel receipt on the floor and when she asked him about it he kicked her in the stomach and ribs. She testified that on another occasion, again after she confronted him about a woman telephoning the house, he kicked her in her stomach and her legs. When she became pregnant with their second child, she said the victim put a gun to her head, threatening to kill her if she did not have an abortion; she testified that she had the abortion. The defendant said after that incident she went to her sister's home, but returned two days later to retrieve some clothes. She stated that the victim swung at her on that occasion, but her sister stopped him. Three weeks later, the victim called her to his home under the pretense of asking her to take food to his father. When she got there, the victim started crying and apologizing to her, promising never to put his hands on her again, and he asked her to marry him.
They married on February 14, 1993. The victim would not let her get a job, telling her that the household chores were her job. He told her he was self-employed, doing landscaping work. The defendant got pregnant again, and was informed after an examination that her husband had given her venereal disease. When the defendant told the victim that her physician told her that her husband had infected her with gonorrhea, he punched her in the back of the head and kicked her in the back and threatened to punch the doctor. The victim allegedly told the defendant that if she tried to leave him he would kill her whole family. On another occasion the defendant and the victim were with "Jackie," leaving the Bottom Line Lounge, and the defendant became angry at her and started "popping" her in the head. The defendant said she kept telling him to stop, saying that she was going to call an officer over, who happened to be on the scene because of a stabbing. The defendant eventually took a gun out of her purse and fired into the air. The defendant said she was arrested for that action, although she said "Jackie" tried to tell the police what happened, but she was never prosecuted. The defendant said she carried the gun in her purse because the defendant asked her to; he could not carry a gun because he was a convicted felon. The defendant said the victim kept five guns throughout the house. She claims that the defendant mentally abused her by telling her that she needed cocaine and would go back to using it. She said that once, when she was cooking, the victim used his thumb and forefinger to form a gun and put it *671 to her head, telling her that she had better have the food ready when he got back. During her pregnancy with their second child, the victim forced her to have oral and anal sex against her will. One week after the birth of their second child, he forced her to have rough sexual intercourse, causing her to seek medical attention. The defendant said she once walked into the kitchen and saw the victim and a Cuban male with what appeared to be a brick of cocaine on the table. The victim allegedly told the defendant that now that she knew what he did, she could not leave him, that there was "no way out." The defendant said she got through all of this by praying and reading her Bible, and never talked about it to anyone. The defendant was shown a photograph of the victim, who, referring to the photograph, told her he was a gangster.
On the night of the killing, defendant said she went with "Shawanda" to a wedding and anniversary party for a friend of the victim. The victim did not go because he said he had some unfinished business to take care of. The defendant and Shawanda left the party about 3:30 a.m. The defendant took Shawanda home, and then went to the Bottom Line Lounge to meet the victim. She claimed that the victim began berating her, asking why she took so long to get there. She said he loudly cursed her, and that he was talking like he was going to "stomp" her. They walked outside, where he allegedly called her a "hoe" and said he was going to start stomping her. He then hit her on the side of her face with some keys. She pleaded with him to stop, but he kept on hitting her. She said he was "steady beating me and beating me." She said she hit him back and that he then became furious and started punching her. The victim then allegedly threatened to kill defendant, and asked for the gun she had in her purse. When she refused to give it to him, he said he would get another one he had, and went to his truck. The defendant said the victim had a secret compartment built into the dashboard of his truck, and she had seen a gun in it as recently as the night before the shooting. After the victim went to his truck, defendant said she got the gun out of her purse and aimed it at him. When she saw him reach for something, she shot him. The defendant admitted telling police on the scene and at the homicide office that they had been robbed. She further admitted that this was not true. The defendant said she lied because the victim was still alive, and because he had previously told her how he hated police, she thought it would only make it worse for her if she told police he had beaten her. The defendant said the homicide detective did not ask about the mark on her face. She was placed in a psychiatric ward in prison, and sought counseling at a battered-women's clinic after her family was able to obtain her release. The defendant said she was five feet eight inches tall and weighed one hundred and twenty-eight pounds at the time of shooting. She said that she fired the gun at her husband because she thought he was going to kill her.
On cross-examination, the defendant said that the victim supplied her with marijuana and cocaine from 1988 until she underwent rehabilitation in 1991. She stated that the Atlanta photograph, which depicted her swollen face after being punched by the victim, had been taken by the victim, not by another person on the trip with them as she had indicated on direct examination. The defendant admitted that the victim took care of all the money after they were married because he was earning it. She drove a new 1993 Jeep Cherokee, and the victim paid the $409 per month note on it. The defendant denied shooting at the victim on the occasion outside the Bottom Line Lounge prior to the murder, claiming she only fired into the air to attract the attention of police. She said she knew the victim had a gun in the secret compartment of his Explorer on the night of the shooting because on the previous night, when she had walked up *672 to his vehicle in their driveway, he had displayed the gun to her and made some comment about being a gangster. The defendant would not confirm that the victim was drunk on the night of the shooting, stating only that he had been doing a lot of drinking. However, she stated that he would hit her more often when he was not drinking. She said that she could not remember how many times the victim struck her outside the Bottom Line Lounge before the shooting. She said the victim was furious when she hit him back because she had never fought back before. The defendant testified that both her and the victim's vehicles were parked on the neutral ground or median of N. Claiborne Avenue. She said that when they left the bar they ended up on the passenger side of his Explorer. But when the victim allegedly went to get a gun inside of the Explorer he entered the driver's side door. After he was shot, the victim got out of the Explorer. The defendant said she went to the vehicle to call an ambulance, but was told by an officer that he had already done so. She then telephoned her sister to tell inform her that she had just shot the victim, and told her that he might "need some blood or something." She said there were more than two people present when the victim was beating her outside the bar. The defendant denied killing the victim because he was going to leave her.
Attorney, John Wilson Reed testified that a member of the defendant's family contacted him on Sunday, November 21, 1993, about representing her. Mr. Reed went to see the defendant in Orleans Parish Prison at approximately 2:15 p.m. that afternoon. He said her face was obviously injured when he saw her, with some bruising around her left eye, a hickey underneath the eye, and a long cut under the eye. He also thought that there had been some other injuries to the rest of her body. Mr. Reed identified a photograph he took of the defendant on the following Wednesday, and said she was healing at that point and had probably looked worse the previous Sunday.
Dr. Shirley Robertson, a staff physician at Orleans Parish Prison, identified a report of her November 22, 1993 examination of the defendant, reflecting complaints of pain in the eyes, the back of the head, temple and lower back, and chest, all secondary to a domestic dispute. The report reflected swelling of the upper right arm, facial cuts below the left eye and beneath the right eye, and swelling of the left eye. There was bruising on the body, with a ten centimeter by three centimeter bruise of the lower back, and bruising of the back of the face and head. X-rays showed no fractures of any kind, and the defendant was given Ibuprofen for pain.
Georgette Lemon, the defendant's sister, testified that she first noticed injuries on the defendant when she was trying on clothes while shopping. She saw bruises around the defendant's thighs and vagina, and one on her back. The defendant said the victim had beaten her with brush while she was bathing. Once, while talking to the defendant on the telephone, Ms. Lemon said she heard the victim in the background calling the defendant a bitch and a whore, and then he slammed down the telephone. After the defendant had left the victim because he ordered her to have an abortion, Ms. Lemon and the defendant returned to the residence to get some clothes. She said the defendant swung and kicked at the defendant, and called her a bitch and a whore. Ms. Lemon said she also started using drugs supplied by the victim, but successfully completed a rehabilitation program like the defendant. The victim came to Ms. Lemon's apartment the day before the shooting with disposable diapers and a bottle of whiskey, and Ms. Lemon asked him to leave because she was clean and her apartment was drug free. Ms. Lemon said that after the defendant telephoned her at 3:00 or 4:00 a.m. on the morning of the shooting, she went to Charity Hospital to donate blood for the victim, but discovered upon her arrival that he had died. Ms. Lemon visited the defendant *673 in jail the day after the shooting, and said the defendant had a bruise under her eye, a scratch or cut on the side that looked like it was healing, and a bump or hickey underneath her eye.
On cross examination, Ms. Lemon said she and her sister spent a lot of time together from 1989 to 1993, but admitted that the defendant had moved away from the victim only once, when he ordered her to have the abortion. She said defendant was not working while she was living with the victim, and that defendant drove new cars. She said the victim always bought the defendant new things after he beat her. Ms. Lemon said that when the defendant telephoned her on the night of the shooting to ask her to go and donate blood for the victim, she did not say how the victim had gotten shot.
Jacqueline Jones testified that she had known the defendant for eighteen years, that they were very good friends, and that she saw the defendant at least two or three days a week. Ms. Jones was the defendant's matron of honor when she married the victim. She said she had seen bruises on the defendant on three occasions, once on her arm, once on her back, and once on her thigh. Ms. Jones was with the defendant and the victim at the Bottom Line Lounge when she fired the shot into the air. After that the victim hit the defendant and came toward her again. On cross examination, Ms. Jones stated that all during the time the defendant was living with and married to the victim, she had seen only the three instances of bruising. She admitted that the victim gave the defendant nice things, and that the couple lived in a nice home with nice things in it. Ms. Jones said she knew the defendant customarily carried a gun, even when just the two of them would go out.
Marion C. Welty testified that the defendant used to live next door to him. On one occasion, the defendant was at his residence visiting with his cousin, who had brought her baby, when the victim came over and "literally just dragged her down the steps" and back to the defendant's house, apparently because she had stayed a little too long. Mr. Welty also testified that at night he would sometimes hear loud cursing and fighting, people hitting the floor, and a female voice crying and objecting to being abused. He said he did not telephone police on these occasions because it was a personal, private matter, and also because he was afraid of the victim. On cross examination, Mr. Welty said that he would have called police if he had believed there was a life-threatening situation next door.
City of New Orleans Grounds Patrol Officer Guy Dupre testified that in November 1993 he was assigned to the autopound, where he used to check in vehicles. Officer Dupre identified a document prepared by him relating to a 1993 green Ford Explorer he checked in at 5:20 a.m. on the morning of November 21, 1993. He noted that there was no damage to the vehicle, and said he did not search the vehicle. He stated that the document indicated that the vehicle was being held for evidence.
Pamela Jenkins, Ph.D., was qualified as an expert in the field of sociology with a specialty in domestic violence. Dr. Jenkins testified in general about domestic violence to the defense of battered women. When asked whether her interview with the defendant was consistent with the working definition of a battered spouse, Dr. Jenkins replied, "Yes." Dr. Jenkins further testified that it was her opinion that the defendant was in fear for her life on the night of the shooting.
On cross examination, Dr. Jenkins stated that she had been paid one thousand dollars for her evaluation of the defendant's case and appearance at trial. She said she "would assume" that if the defendant lied to her, her opinions would no longer be valid. Dr. Jenkins said that the study of domestic violence would allow the jurors to understand the context in which the defendant lived and the actions *674 she took. She admitted that it is possible that the theory of "domestic violence" could be used to defend someone who is guilty.
Det. Norman McCord testified on rebuttal. Det. McCord testified that the police went through the Ford Explorer, but did not locate a weapon. He admitted that they did not take the vehicle apart.
Mark Pitre, a loss prevention specialist for BellSouth Mobility, testified that the victim's cellular telephone bills reflected that a phone call was placed on November 21, 1993, at 3:58 a.m., to number XXX-XXX-XXXX. The call made immediately prior to that one had been placed at 3:19 a.m. He said there were no subsequent calls reflected on that particular bill, which was for the monthly billing period running from October 28 to November 28, 1993. On cross examination, Mr. Pitre stated that he could say only that the bill was in the victim's name, not to whose telephone the bill related.
Kathleen Causey, a security department specialist for BellSouth, testified that records for telephone number XXX-XXX-XXXX, covering the billing periods of October 22 to November 22, 1993, and November 23 to December 23, 1993, showed that the subscriber and person responsible for that account was Shwanda Matthews.

ERRORS PATENT
A review of the record reveals no errors patent.

ASSIGNMENT OF ERROR NO. 1:
By this assignment of error, the defendant claims the trial court erred in refusing to admit the testimony of Dr. Roger Anastasio, a psychiatrist. The doctor's testimony was proffered.
La. C.E. art. 702, cited by defendant, provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The ultimate fact at issue in the present case was whether the killing of Roger Scott was justifiable. A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. R.S. 14:20(1). When a defendant asserts self-defense, the State has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. State v. Ross, 98-0283, p. 10 (La.App. 4 Cir. 9/8/99), 743 So.2d 757; State v. Byes, 97-1876, p. 8 (La.App. 4 Cir. 4/21/99), 735 So.2d 758, 764.
The defendant claimed she was a victim of domestic abuse at the hands of the victim, and that at the time she shot him she feared he was in the act of procuring a gun from a compartment in his dashboard with which to kill her. Evidence of the defendant's abuse by the victim was presented through the defendant's own testimony, and the testimony of her sister, a friend, a neighbor, and Dr. Pamela Jenkins, a sociologist. An attorney who visited the defendant within twelve hours after the shooting and a prison physician both testified as to the presence of the defendant's injuries.
Dr. Anastasio testified on proffer that when he examined the defendant on December 13, 1993, she was having auditory and visual hallucinations; she was seeing the victim and he was telling her she was no good and that she should end her life. Dr. Anastasio said he diagnosed the defendant as psychotic, but said he later became more impressed with the depressive component of her problem and changed her diagnosis to "major depressant single episode." He prescribed medication for her and last saw her in September 1994.
The initial question is whether such evidence is relevant at all. The trial court *675 found the evidence was not relevant. Relevant evidence is generally admissible; irrelevant evidence is generally inadmissible. La. C.E. art. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." La. C.E. art. 401. A trial court's ruling as to relevancy will not be disturbed absent a clear abuse of discretion. State v. Lewis, 97-2854, p. 20 (La. App. 4 Cir. 5/19/99), 736 So.2d 1004, 1017; State v. Badon, 95-0452, p. 8 (La.App. 4 Cir. 11/16/95), 664 So.2d 1291, 1296.
It is well-settled that "[w]hen a defendant is tried upon a plea of `not guilty,' evidence of insanity or mental defect at the time of the offense shall not be admissible." La. C.Cr.P. art. 651. Although the defendant initially pleaded not guilty and not guilty by reason of insanity, she later withdrew that plea and was proceeding at trial under a plea of not guilty. Therefore, evidence regarding the defendant's insanity or mental defect at the time of the offense was inadmissible and irrelevant.
The defendant claims in her brief on appeal that she wished to call Dr. Anastasio to "describe to the jury her condition and mental status about three weeks after the shooting and to explain that in his expert psychiatric opinion, her acute medical symptoms in December of 1993 resulted from and were consistent with having suffered the trauma on November 21, 1993 that she related." The defendant claims this evidence would have helped prove that she had been "profoundly affected by the events of November 21, 1999[sic]." She claims this in turn would have been a fact for the jury to consider in deciding how much weight to give her testimony about the event. It could also have been cited by the defense in closing argument to rebut the State's claim that she fabricated a story about the need to defend her life.
Under the circumstances in this particular case, the defendant fails to show that evidence of her mental condition, three weeks or more after the crime was relevant as to whether or not she could have reasonably believed at the time of the crime that she was in imminent danger of losing her life or of receiving great bodily harm. Furthermore, that his killing was necessary to save herself from that danger.
As to such testimony being supportive of the defendant's credibility regarding her claim of self-defense, the defendant does not suggest how Dr. Anastasio's testimony regarding her deteriorated mental condition three weeks after being charged with the murder of her husband would be relevant to her credibility. Even assuming some minimal degree of relevancy, the slight probative value of such evidence would be substantially outweighed by the danger of confusion of the issues or of misleading the jury-the jury could have easily misinterpreted testimony by the psychiatrist as somehow relieving the defendant of culpability because of some mental disease or defect at the time of the offense. La. C.E. art. 403.
The defendant also contends that the patient history given by the defendant to Dr. Anastasio would have been independently admissible for the truth of the matter asserted pursuant to La. C.E. art. 803(4), which provides that the following are not excluded by the hearsay rule:
Statements made for purposes of medical treatment and medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis in connection with treatment.
Dr. Anastasio testified on proffer that the defendant gave a history during their first two visits, on December 13 and 27, 1993. She related that she shot the victim in the course of an argument and physical fight. She stated that the victim had attempted *676 to take a gun from her in order to shoot her, and that when she refused to give it to him, he went to his truck to get his own gun, and she shot him while he was in the truck.
Evidence of such statements is admissible not only to show the basis for the physician's opinion, but also to show the truth of the matter asserted. See 1999 Authors' Notes to La. C.E. art. 803(4), n. 2.[1] As such, it can be assumed that even when the physician's testimony is not admissible for any other purpose, it would be admissible for the truth of the matter asserted. The reason these statements are excepted from the general rule barring hearsay evidence is that "their reliability is assured by the likelihood that the patient believes that the effectiveness of the treatment received will depend upon the accuracy of the information provided to the physician." McCormick on Evidence, § 277 (4th Ed. 1992). However, in the instant case, any such assurance of reliability is outweighed by the danger that defendant, in jail awaiting trial for second degree murder, was simply making a self-serving statement, hoping to somehow exculpate herself. In McCormick, § 277 at n. 8, the issue of the admissibility of histories as given to psychiatrists is addressed as follows:
With regard to statements to psychiatrists, the reasoning that supports the hearsay exception for statements to physicians generally may be questioned, since the credibility of the statement may be skewed by the very condition under inquiry, as well by the breadth of the psychiatric interview. The practice of admitting psychiatric interviews with instructions limiting their use to showing the basis of the psychiatrist's opinion has greater validity than a similar limitation upon medical history generally. The wide variation of possible situations suggests resort to the judge's discretion to exclude under Federal Rule 403 if appropriate. (Emphasis added). (Citations omitted).
In might be argued that all that was necessary for Dr. Anastasio's treatment of the defendant was his knowledge that she had shot and killed her husband. It can easily be argued that it was this fact alone which caused any mental trauma. In fact, the alleged self-defense aspects of the shooting would probably tend to, if anything, mitigate any self-blame for the incident. After all, the moral underpinning of the justifiable homicide self-defense provision is that the actor had no choice but to kill to save herself from death or great bodily harm, or to prevent a violent forcible felony. Therefore, pursuant to La. C.E. art. 403, the trial court could have properly limited Dr. Anastasio's testimony concerning the history given by the defendant relative only to the fact that she shot and killed her husband, without mention of the purported self-defense justification. That testimony would have served no purpose, and assuming it would have, the danger of misleading the jury by having a psychiatrist testify as to such fact, and little else, substantially outweighed any slight probative value. Thus, the trial court could have barred any testimony by Dr. Anastasio about the history pursuant to La. C.E. art. 403. Thus, it cannot be said that the trial court abused its discretion in excluding such evidence.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2
By this assignment of error, the defendant claims the trial court erred in refusing to allow the jury to view domestic violence pamphlets. The trial court permitted the defendant to call an Assistant District Attorney to the witness stand to identify the two pamphlets, and allowed *677 the pamphlets to be introduced into evidence, but would not allow them to be viewed by the jury.
The first pamphlet, entitled "Every 15 seconds a Woman is Battered," was four pages long, with illustrations on one page, and bore a picture of the Orleans Parish District Attorney on the cover, along with a message from him to the reader. The second pamphlet, entitled "What Everyone Should Know About Family Violence," was fifteen pages long, with illustrations on each page.
The defendant admits that Dr. Jenkins covered the contents of the pamphlets during the course of her testimony. In fact, defense counsel enlarged a "Wheel of Violence" graphic contained in one pamphlet and questioned Dr. Jenkins regarding it. Dr. Jenkins testified that she used this particular graphic in teaching and training, and that it was contained in nearly every textbook on the subject of domestic violence. The defendant argues that the pamphlets would have been allowed the jury to see that Dr. Jenkins' views and opinions were mainstream, and that she was not biased. What the defendant is arguing is that she should have been allowed to distribute these pamphlets to the jury in order to support Dr. Jenkins' credibility. However, the credibility of a witness may be attacked or supported by evidence in the form of general reputation only, which may refer only to character for truthfulness or untruthfulness. La. C.E. art. 608(A)(1). Accordingly, the trial court properly excluded this evidence.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 3
By this assignment of error, the defendant claims the trial court erred in refusing to allow Dr. Jenkins to testify that the defendant met the definition of a battered spouse or victim of domestic violence.
The trial court ruled that Dr. Jenkins could not state, in fact, that the defendant was a battered woman. The trial court stated that the issue of whether or not the defendant was a battered spouse was a question for the jury. The court cited as authority State v. Foret, 628 So.2d 1116 (La.1993) and State v. Folse, 623 So.2d 59 (La.App. 1 Cir.1993). In Foret, the Louisiana Supreme Court reversed the defendant's conviction for attempted molestation of a juvenile, finding that an expert witness improperly testified that in his opinion the alleged victim was telling the truth as to an incident of sexual abuse perpetrated by the defendant. The court looked at the role of expert testimony in assisting a jury to understand why a juvenile sexual abuse victim might, for instance, delay reporting incidents of abuse. The court stated that the expert opinion testimony must seek to demonstrate or explain in general terms the behavioral characteristics of child abuse victims regarding the disclosure of such incidents, thus providing a scientific perspective for the jury according to which it can evaluate the victim's testimony for itself, without the expert giving testimony directly concerning the victim's credibility. 628 So.2d at 1130.
In Folse, the court found that the trial court had properly sustained defense counsel's objection to the prosecutor's question as to whether or not it was the opinion of an expert witness that a juvenile sexual abuse victim was telling the truth. The court further found that, although the defendant had failed to object to similar testimony by the expert as to a second victim, there was no error because the expert made it clear on cross-examination that he could not say that the second victim was telling the truth, only that the information given by her was consistent with the dynamics of sexual abuse. 623 So.2d at 68.
La. C.E. art. 608 provides that the credibility of a witness may be supported only by evidence in the form of reputation for truthfulness or untruthfulness. Applying La. C.E. art. 608 and Foret and Folse to the instant case, the trial court apparently felt that permitting Dr. Jenkins to testify *678 that in her opinion defendant was a battered spouse would be too close to an impermissible statement that the defendant was telling the truth insofar as her history of abuse. Under these circumstances, it cannot be said that the trial court erred in reaching that conclusion and barring such testimony.
Moreover, the trial court stated that it would allow Dr. Jenkins to give a definition of a battered woman and to testify that the history gleaned from the defendant was consistent with that of her being a battered woman or abused spouse. The trial court further allowed defense counsel to ask Dr. Jenkins, as an expert in the field of domestic violence, her opinion as to the effects of the history of "assaulted violence" on the defendant's state of mind on the night of the shooting. Over the objection of the State, Dr. Jenkins testified that it was her opinion that on the night of the shooting the defendant was in fear for her life.[2]
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 4
By this assignment of error, the defendant claims the trial court erred in admitting telephone records into evidence.
The defendant testified on direct examination that after she shot her husband she telephoned her sister, Georgette Lemon, so she could go to the hospital and donate blood for the victim. In rebuttal, the State called Mark Pitre, a Bell South Mobility loss prevention specialist, who identified records for a cellular telephone account in the name of Roger Scott. The records had been faxed from Bell South's Atlanta office, where the information was stored. He testified from the telephone records that one telephone call was placed on November 21, 1993 at 3:58 a.m. to XXX-XXX-XXXX, that the call prior to that one had been placed at 3:19 a.m., and that there had been no calls placed after that during the billing cycle, through November 28, 1993. Kathleen Causey, a security department specialist for BellSouth, testified that records for telephone number XXX-XXX-XXXX reflected that the subscriber and person responsible for that account was Shwanda Matthews.
The defendant argues on appeal that the records introduced by Mr. Pitre constitute hearsay evidence, and that a proper foundation was not laid to introduce them pursuant to the business records exception of La. C.E. art. 803(6). The record does not reflect precisely on what ground defense counsel objected at trial, as it appears that the specific grounds of the objection were discussed off the record. It must be presumed the objection was on the same ground urged on appeal.
Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C); State v. Castleberry, 98-1388, p. 18 (La.4/13/99), 758 So.2d 749, 765, cert. denied, Castleberry v. Louisiana, ___ U.S. ___, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999); State v. Raby, 98-1453, pp. 8-9 (La.App. 4 Cir. 6/2/99), 738 So.2d 699, 703. Hearsay is not admissible except as otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802; State v. Richardson, 97-195, p. 13 (La.App. 4 Cir. 3/3/99), 729 So.2d 114, 121, writ denied, 99-1087 (La.9/24/99), 747 So.2d 1119. Evidence is only considered hearsay if it is a "statement." See La. C.E. art. 801(C); State v. Armstead, 432 So.2d 837, 840 (La.1983). A statement is an oral or written assertion, or nonverbal conduct of a person, if it is intended by him as an assertion. La. C.E. art. 801(A).
*679 In Armstead, the State linked the defendant to a number of obscene telephone calls by introducing telephone company computer printouts showing that several of the calls had been traced to a number assigned to the defendant's mother. The defendant objected to the introduction of those computer printouts on the same basis as defendant in the instant case-that the State failed to lay the proper foundation for the printouts to be admissible under the business records exception to the hearsay rule. In rejecting the defendant's argument, and finding that the computer printouts did not even constitute hearsay statements, the court stated:
There is no doubt that computer printouts which reflect computer stored human statements are hearsay when introduced for the truth of the matter asserted in the statements. United States v. Ruffin, 575 F.2d 346, 356 (2d Cir.1978); Comment, Guidelines for the Admissibility of Evidence Generated by Computer for Purposes of Litigation, 15 U.C. Davis L.Rev. 951, 963 (1982); Note, Appropriate Foundation Requirements for Admitting Computer Printouts Into Evidence, 1977 Wash.U.L.Q. 59, 61, 63 (1977); J. Roberts, A Practitioner's Primer on Computer-Generated Evidence, 41 U.Chi.L.Rev. 254, 272 (1973). The output represents only the by-product of a machine operation which uses for its input "statements" entered into the machine by out of court declarants.
From our understanding of the record, however, we are not dealing with computer stored human statements or assertions which have been retrieved from the computer and introduced into evidence in printout form. The invention of electronic switching systems in telecommunications has eliminated the need for manual involvement in a telephone trace. Since the computer is actually responsible for making the telephone connection, the computer can be programmed to record the source of any incoming call. Thus, the printout of a telephone trace in this type of system does not represent evidence of computer stored declarations. The computer generated data by recording the source of various telephone connections as it was making them. Therefore, the evidence in this case was generated solely by the electrical and mechanical operations of the computer and telephone equipment, and was not dependent upon the observations and reporting of a human declarant.
We therefore view the printout offered as evidence in this case differently from printouts of human statements fed into the computer. Since the computer was programmed to record its activities when it made the telephone connections, the printout simply represents a self-generated record of its operations, much like a seismograph can produce a record of geophysical occurrences, a flight recorder can produce a record of physical conditions onboard an aircraft, and an electron microscope can produce a micrograph, which is a photograph of things too small to be viewed by the human eye.
We pretermit consideration of the defendant's contention that the printout in this case was not properly qualified as a business record, since we find that such a foundation was not required. The printout of the results of the computer's internal operations is not hearsay evidence. It does not represent the output of statements placed into the computer by out of court declarants. Nor can we say that this printout itself is a "statement" constituting hearsay evidence. The underlying rationale of the hearsay rule is that such statements are made without an oath and their truth cannot be tested by cross-examination. State v. Arnold, 367 So.2d 324 (La.1979); State v. Joya, 354 So.2d 543 (La.1978); State v. Raymond, 258 La. 1, 245 So.2d 335 (1971), appeal dismissed, cert. denied, 404 U.S. 805, 92 S.Ct. 101, 30 L.Ed.2d 38; E. Cleary, McCormick on Evidence § 245 (2d Ed.1972); 5 Wigmore *680 on Evidence § 1361 (Chadbourn Rev.1974). Of concern is the possibility that a witness may consciously or unconsciously misrepresent what the declarant told him or that the declarant may consciously or unconsciously misrepresent a fact or occurrence. State v. Arbuthnot, 367 So.2d 296 (La.197[9]). With a machine, however, there is no possibility of a conscious misrepresentation, and the possibility of inaccurate or misleading data only materializes if the machine is not functioning properly. For this reason, apparently, most definitions of hearsay are limited to out of court statements by a person made out of court and thus not under oath, and not subject of cross-examination or confrontation. State v. Perniciaro, 374 So.2d 1244 (La.1979); State v. Martin, 356 So.2d 1370 (La.1978); State v. Arnold, supra; State v. Sheppard, 350 So.2d 615 (La.1977); State v. Launey, 335 So.2d 435 (La.1976); State v. Nix, 327 So.2d 301 (La.197[5]), cert. denied 425 U.S. 954, 96 S.Ct. 1732, 48 L.Ed.2d 198; See Unif.R.Ev. 62(1) & 63; F.R.Ev. (R.D.1971) 801(a) & (c).
We therefore view the computer generated data in this case as demonstrative evidence of a scientific test or experiment. See Reliability of Scientific Devices Telephone Calling Line Identification, 2 Am.Jur. Proof of Facts 2d 545. See generally McCormick, supra, at §§ 202-211; Strong, Questions Affecting the Admissibility of Scientific Evidence, 1970 U.Ill.L.F. 1 (1970). The defendant's argument that the person who made the record should have been called is without merit since the computer itself made the record, not a person who could have been called to the stand.
One last note is in order. The defendant, in his objection to the introduction of the printout, only argued that Mr. Henry Arceneaux, security manager for South Central Bell, was not the proper person to introduce the evidence. He did not argue that a proper foundation had not been laid in terms of the accuracy and reliability of the computer trace. While we are certain that such a predicate would be required, we need not decide in this case the appropriate standard to be utilized in evaluating the sufficiency of evidence elicited in such a predicate since no contemporaneous objection on this ground was made. (Footnotes omitted).
432 So.2d at 839-841. See also State v. Savage, 575 So.2d 478 (La.App. 3 Cir. 1991), writ denied, 586 So.2d 556 (La.1991)(telephone bills not hearsay evidence under standard enunciated in State v. Armstead).
In the instant case, Mr. Pitre testified that he was a loss prevention specialist with BellSouth Mobility; that he responded to subpoenas; that he reviews records of cell phone subscriber information and bills; that the documentation is kept by the company in the regular course of its business; that the custodian of the records was in Atlanta, the location of the home office; and that the records he had in court were facsimiles of the records maintained in Atlanta. Mr. Pitre also testified that the records represented bills for three monthly billing cycles.
Mr. Pitre did not testify as to how the information contained in these records was compiled, or how the physical records themselves were generated. However, it can only be concluded that, as in Armstead, the telephone records were not compiled by human beings entering information into a computer. Taking judicial notice of the advances in technology since Armstead, decided in 1983, it would defy logic to even suggest that the information contained in the cellular telephone records of Roger Scott be considered as statements, i.e., oral or written assertions by a person or persons. Rather, the records are obviously computer-generated printouts of the computer-recorded numbers of telephone calls placed by a person or persons using a cellular telephone under an account in the name of Roger Scott. As in *681 Armstead, the records are not hearsay evidence.
The defendant's argument on appeal is limited, as it must be assumed her objection at trial was, to the assertion that the State failed to lay a proper foundation for the admission of hearsay evidence under the business records exception to the hearsay rule. The defendant did not object to the failure of the State to lay a proper foundation for the admissibility of the records as non-hearsay evidence. A defendant cannot avail himself of an alleged error unless he made a contemporaneous objection at the time of the error. La. C.Cr.P. art. 841(A); State v. Seals, 95-0305, p. 5 (La.11/25/96), 684 So.2d 368, 373, cert. denied, Seals v. Louisiana, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Brooks, 98-0693, p. 9 (La. App. 4 Cir. 7/21/99), 758 So.2d 814, 819. Not only does an objection have to be made, but La. C.Cr.P. art. 841(A) requires that a defendant make known the grounds for his objection, and he is limited on appeal to those grounds articulated at trial. Brooks, supra; State v. Buffington, 97-2423, p. 9 (La.App. 4 Cir. 2/17/99), 731 So.2d 340, 346.
Thus, because the defendant failed to contemporaneously object at trial on a proper ground, the issue of whether the State failed to lay a proper foundation for the admissibility of the non-hearsay records is not before the court. However, based on the above-mentioned testimony of Mr. Pitre, it cannot be said that the trial court abused its discretion in concluding that the evidence referred to by Mr. Pitre was in fact what it was purported to be-the cellular telephone records pertaining to the account of Roger Scott. A duplicate copy, which must be considered to include a facsimile, is admissible to the same extent as an original unless a genuine question is raised as to the authenticity of the original. La. C.E. art. 1003; State v. Joe, 28,198, pp. 7-8 (La.App. 2 Cir. 7/26/96), 678 So.2d 586, 592, writ denied, 97-0559 (La.10/31/97), 703 So.2d 16. The two pages of Bell South telephone records in evidence each have the Bell South corporate logo on them and appear to be the pages of an ordinary monthly telephone billing statement. There is nothing to indicate that they are facsimiles of anything other than what they are purported to be, and defendant raises no "genuine" question as to the authenticity of the original computer-generated billing statement.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 5
By this assignment of error, the defendant claims the trial court erred in denying the defendant's motion for new trial based on the discovery of the victim's rap sheet characterizing him as "armed and dangerous," which she characterizes as exculpatory.
La. C.Cr.P. art. 851 provides, insofar as cited by the defendant:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
* * *
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
* * *
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
*682 In State v. Labran, 97-2614 (La.App. 4 Cir. 5/26/99), 737 So.2d 903, this court stated:
In order to obtain a new trial based on newly discovered evidence, the defendant has the burden of showing (1) the new evidence was discovered after trial, (2) the failure to discover the evidence at the time of trial was not due to the defendant's lack of diligence, (3) the evidence is material to the issues at trial, and (4) the evidence is of such a nature that it would probably produce a different verdict in the event of a new trial.
97-2614 at p. 6, 737 So.2d at 907, quoting State v. Dabney, 91-2051, p. 15 (La.App. 4 Cir. 3/15/94), 633 So.2d 1369, 1380, writ denied, 94-0974 (La.9/2/94), 643 So.2d 139.
Generally, in ruling on a motion for new trial based on newly discovered evidence, the trial court must ascertain whether another jury presented with all the evidence, including the newly discovered evidence, would probably reach a different verdict. State v. Cureaux, 98-0097, p. 4 (La.App. 4 Cir. 5/26/99), 736 So.2d 318, 321. The trial court has much discretion in ruling on a motion for new trial. Id. Review of the trial court's ruling is limited to determining whether the trial abused its discretion. Labran, supra.
Defense counsel filed a motion on February 2, 1994, requesting the victim's arrest records. The State essentially admitted at the hearing on the motion for new trial that it was at fault in failing to turn over the victim's "rap sheet" to defense counsel. The defense counsel obtained the rap sheet when she subpoenaed records from St. Martin Parish pertaining to outstanding drug charges against the victim in that parish. The victim's rap sheet, run on July 27, 1993, shows two identical January 29, 1992 entries listing the victim's "Status" as "ARMED DANGEROUS RESIST ARREST."
The defendant claims this evidence of the defendant's status would have been helpful in cross-examining New Orleans police officers involved in the case. She also claims knowledge of this evidence might have led to the discovery of police officers who could have been subpoenaed to present either reputation testimony concerning the victim being armed and dangerous or evidence admissible pursuant to La. C.E. art. 406 regarding the defendant's habit of carrying a gun. The defendant claims the information in the rap sheet would have been circumstantial evidence supporting her testimony that the victim kept a gun in a secret compartment in Ford Explorer, and that he was going to retrieve that gun at the time she shot him.
The defendant cites no authority for the admissibility of the rap sheet. While La. C.E. art. 404(B)(2) provides that an accused pleading self-defense in a domestic violence situation can introduce evidence of the dangerous character of the victim, the methods of proving character are governed by La. C.E. art. 405, which provides for proof by testimony as to general reputation, and by specific instances of conduct in a case such as the instant one where a character trait of the victim is an essential element of the defendant's defense. The introduction of the victim's rap sheet noting a person's status-as subjectively characterized by police-as armed and dangerous does not fall under either of these methods of proof. Pursuant to La. C.E. art. 406, evidence of a habit of a person to prove that the conduct of the person was in conformity with such habit is admissible and "may consist of testimony in the form of an opinion or evidence of specific instances of conduct sufficient in number to warrant a finding that the habit existed or that the practice was routine." Again, the introduction of the rap sheet, more specifically, the notations contained therein classifying the defendant as armed and dangerous, which notations are all defendant's argument pertains to, does not equate with one of these methods of proof; it is not testimony and it is not evidence of "specific instances of conduct."
*683 Because the evidence in the rap sheet cited by the defendant would not have been admissible as evidence of the victim's character, it cannot be considered newly discovered evidence upon which the trial court could have granted a new trial. The trial court could have felt that, for the same reason, any advantage the defendant would have gained through discovery of the rap sheet was purely speculative, and therefore it could not be said that the rap sheet was of such a nature that discovery of it would have affected the outcome of the trial. Under these circumstances, it cannot be said that the trial court abused its discretion in denying the defendant's motion for a new trial.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 6
By this assignment of error, the defendant claims the trial court erred in refusing to give a requested jury instruction regarding self-defense.
La. C.Cr.P. art. 803 mandates that the trial court instruct the jury as to the law applicable to each case. La. C.Cr.P. art. 807 provides that the State and the defendant shall have the right before argument to submit to the court special written charges for the jury. A requested special charge "shall be given" if it does not require qualification, limitation or explanation, and if it is wholly correct and pertinent. Id; State v. Craig, 95-2499, p. 7 (La. 5/20/97), 699 So.2d 865, 869, cert. denied, Craig v. Louisiana, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997). Any special charge must be supported by the evidence. Id. However, such charge need not be given if it is included in the general charge or in another special charge. La. C.Cr.P. art. 807; Craig; State v. Hawkins, 96-0766, p. 8 (La.1/14/97), 688 So.2d 473, 480. Jury instructions must be considered as a whole. See State v. Thibodeaux, 98-1673, p. 17 (La.9/8/99), 750 So.2d 916, 929.
The trial court instructed the jury on self-defense as follows:
Jurors, a homicide is justifiable when committed in self-defense by one who reasonably believes that she is in imminent danger of losing her life or receiving great bodily harm, and that the killing is necessary to save herself from that danger, when committed for the purpose of preventing a violent or forcible felony involving danger to life, or of great bodily harm by one who reasonably believes that such an offense is about to be committed, and such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to her own life or person if she attempted to prevent the felony without the killing.
A person is justified in using force in self-defense where the danger that threatens her appears to her acting as a reasonable person, under the particular circumstances to be real and imminent, even though it should later develop that there was no real or actual danger.
A person who is the aggressor or who brings on a difficulty may not claim the right of self-defense, unless she withdraws from the conflict in good faith and in such a manner that her adversary knows or should know that she desires to withdraw or discontinue the conflict.
Jurors, a defendant who has been indicted for homicide and asserts that she acted in self-defense of herself or another does not assume any burden of proof whatsoever on that issue. The State of Louisiana has the entire and affirmative burden of proving beyond a reasonable doubt that a homicide was erroneously committed and was not perpetrated in self-defense or in defense of another.
Evidence concerning previous violent conduct, threats or dangerous character of the decedent can be considered by you in deciding whether the defendant reasonably apprehended danger.
*684 The defendant's proposed written jury instructions, as filed in the trial court and as quoted in her brief on appeal, are listed in unnumbered paragraphs. However, in her argument on appeal she refers to the instructions by paragraph numbers. She claims the trial court failed to instruct the jury as to paragraphs numbered four, five, six, eight and nine.[3] The very short transcript of the charging conference reflects that the trial court stated that the defendant only requested two charges, one regarding self-defense and the second regarding the defendant's dangerous character. However, it is unclear how much of the complete requested written charge was encompassed within these "two" charges. The trial court agreed to give some of the requested charge, but refused to give part. Considering that the written request is in the record, all of the defendant's claims as to the jury charges will be addressed.
The substance of paragraph numbers five and six clearly were contained in the trial court's jury instructions. As to number four, it lists four factors which are said to be "[s]ome factors" jurors should consider in determining whether the defendant had a reasonable belief that the killing was necessary:
1) the possibility of avoiding the necessity of taking human life by retreat;
2) the excitement and confusion of the occasion;
3) the possibility of preventing the danger to herself by using force less than the killing; and
4) the defendant's knowledge of her assailant's dangerous character.
These factors are taken verbatim from jury instructions given by the trial court in State v. Harvey, 26,613 (La.App. 2d Cir.1/25/95), 649 So.2d 783, writs denied, 95-0430, 657 So.2d 1026, 95-0625 (La.6/30/95), 657 So.2d 1028. This identical charge was also used by the trial courts in the following cases: State v. Lee, 498 So.2d 1177, 1180 (La.App. 3 Cir.1986), writ denied, 504 So.2d 874 (La.1987); State v. Necaise, 466 So.2d 660, 666, n. 4 (La.App. 5 Cir.1985). These factors have been cited by the Second Circuit as those which "bear upon the reasonableness of [a defendant's] belief that deadly force was necessary." See State in Interest of D.S., 29,554 (La. App. 2 Cir. 5/7/97), 694 So.2d 565, 568, citing Harvey, supra.
The defendant focuses on factor number four, regarding a defendant's knowledge of the decedent's dangerous character, referring to this factor as "[o]f critical importance." The last paragraph of the trial court's jury instruction on self-defense adequately instructs the jury as to this factor, informing the jury not only that it may consider the decedent's "dangerous character," but also his "previous violent conduct" and "threats" in determining whether defendant reasonably apprehended danger. The trial court properly used the neutral term "decedent," neither referring to Roger Scott as an assailant or as a victim.
As to the issue of retreat, since the evidence indicates that the defendant could have retreated-rather than stood there while the victim walked around to the driver's door, opened the door, entered the vehicle, and allegedly reached for a gun, at which point she shot him-the trial court's failure to specifically instruct the jury to consider this factor benefited the defendant, not prejudiced her. The defendant does not even specifically argue the issue of a retreat instruction. As to the possibility of using less than deadly force, there was no evidence justifying any such instruction. Further, such an instruction could have encouraged the jury, conditioned by years of watching unrealistic portrayals of fictional television shooting incidents, to speculate that perhaps the defendant could have shot the decedent in his hand to disable him, or performed *685 some other such fantastic feat. This instruction could have easily prejudiced the defendant. As for the "excitement and confusion of the occasion," this simple instruction alone could have led the jury to wrongly conclude that a subjective sense of excitement or confusion on the part of the defendant could have justified the killing. The trial court could have felt that it could not give the instruction as requested, without further explaining or qualifying it, such as by having to stress that the test was a reasonable person under like circumstances. Thus, the trial court would not have been required to give it. See La. C.Cr.P. art. 807; Craig, supra.
Finally, the defendant cites her last requested jury instruction, what she refers to as instruction nine, but which appears to be number eight. The defendant requested that the trial court instruct the jury that if a defendant raised self-defense, and the State did not prove beyond a reasonable doubt that the killing was not committed in self-defense or to prevent a violent or forcible felony, the defendant must be acquitted. This instruction was included in the trial court's charge as a whole, considering that the court's charge specifically informed the jury that the State had the burden of proving beyond a reasonable doubt that the defendant did not commit the homicide in self-defense, and that the jury must consider the defendant innocent until proven guilty beyond a reasonable doubt by the State.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 7
By this assignment of error, the defendant claims the trial court erred in failing to specifically re-instruct the jurors that self-defense was a defense to manslaughter.
One hour and fifty-five minutes after receiving its instructions and retiring, the jury returned. The following colloquy occurred:
BY A JUROR:
We have three questions.
BY THE COURT:
You have three questions. Who is the foreperson?
BY A JUROR:
I am.
BY THE COURT:
Very well. Sir, would you tell me what your question is?
BY A JUROR:
Our first question is: We need two definitions, three definitions. We need all three definitions.
BY THE COURT:
I only defined, though, second-degree murder and manslaughter.
BY A JUROR;
Right.
BY THE COURT:
What else did you want?
BY A JUROR:
We need second-degree murder with reference to self-defense and manslaughter.
BY THE COURT:
Is that correct?
BY A JUROR:
Yes, he was right.
BY THE COURT:
Very well.
The transcript reflects that the trial court then read the "above-requested definitions to the jury panel." While the record does not show a timely objection by defense counsel at the time, testimony at a subsequent hearing indicated that a timely objection was made. At that hearing the trial court stated that defense counsel had requested in chambers immediately following the re-instruction that the court specifically instruct the jury that the defense of self-defense was applicable to both second degree murder and manslaughter. In explaining why it did not give the requested instruction, the court stated that it had not *686 been something the jurors expressed concern about. The court further stated that it had been very hesitant about giving the jury information that was not specifically in response to their request. The colloquy does not indicate that the jurors believed that self-defense was not a defense to manslaughter. Rather, it appears the jurors simply wanted the three definitions-second degree murder, manslaughter and self-defense-repeated for them. The record reflects that those three definitions were again given to the jury. Under these circumstances, it cannot be said that the trial court erred in giving the jurors only what they requested.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 8
By this assignment of error, the defendant claims the trial court erred in imposing an excessive sentence.
La. Const. art. I, § 20 explicitly prohibits excessive sentences; State v. Baxley, 94-2982, p. 4, (La.5/22/95), 656 So.2d 973, 977. Although a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment. State v. Brady, 97-1095, p. 17 (La.App. 4 Cir. 2/3/99), 727 So.2d 1264, 1272; State v. Francis, 96-2389, p. 6 (La.App. 4 Cir. 4/15/98), 715 So.2d 457, 461, writ denied, 98-2360 (La.2/5/99), 737 So.2d 741. However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society. Baxley, 94-2984 at p. 10, 656 So.2d at 979, citing State v. Ryans, 513 So.2d 386, 387 (La.App. 4 Cir.1987), writ denied, 516 So.2d 366 (La.1988). A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Johnson, 97-1906, pp. 6-7 (La.3/4/98), 709 So.2d 672, 677; State v. Burton, 98-0096, pp. 6-7 (La.App. 4 Cir. 9/1/99), 746 So.2d 74, 78-9. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. Baxley, 94-2982 at p. 9, 656 So.2d at 979; State v. Hills, 98-0507, p. 5 (La.App. 4 Cir. 1/20/99), 727 So.2d 1215, 1217.
In reviewing a claim that a sentence is excessive, an appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La. C.Cr.P. art. 894.1 and whether the sentence is warranted under the facts established by the record. State v. Trepagnier, 97-2427, p. 11 (La.App. 4 Cir. 9/15/99), 744 So.2d 181; State v. Robinson, 98-1606, p. 12 (La.App. 4 Cir. 8/11/99), 744 So.2d 119. If adequate compliance with La. C.Cr.P. art. 894.1 is found, the reviewing court must determine whether the sentence is imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged. State v. Ross, 98-0283, p. 8 (La.App. 4 Cir. 9/8/99), 743 So.2d 757; State v. Bonicard, 98-0665, p. 3 (La.App. 4 Cir. 8/4/99), 752 So.2d 184, 185.
In the instant case, the defendant was convicted of manslaughter, a violation of La R.S. 14:31, and which, at the time of her offense, provided for a sentence of imprisonment at hard labor for not more than twenty-one years. The trial court sentenced the defendant to twenty-one years at hard labor, sixteen years suspended, and five years probation. The defendant argues that her "5 year prison sentence" is excessive.
The defendant had a prior municipal conviction for theft, a prior arrest for possession of stolen property, and the prior arrest for illegal use of a weapon in connection with her discharging a gun into the air outside of the same bar where she would shoot her husband to death fifteen months later. That shot was allegedly *687 fired to attract the attention of nearby police because her husband was battering her. The presentence investigation report reflected that the victim's father did not wish to see the defendant incarcerated because of concern about the couple's children. The report recommended that the defendant be sentenced to five years at hard labor, with three years suspended and five years active probation.
The court stated that it was aware of the battered woman defense, but said that in the defendant's case there was scant evidence of a battery, only the testimony of her neighbor, Ms. Welty. The defendant correctly points out that there was other evidence indicating a battery on the night of the shooting. Detective McCord, the investigating officer to whom the defendant lied about the shooting, testified that the defendant had a hickey on her face, the observation of which he admitted immediately caused him to think of a domestic abuse situation. John Reed, an attorney, testified that the defendant had injuries to her face and body when he visited the defendant in jail less than twelve hours after the November 21, 1993 early morning shooting. An Orleans Parish Prison staff physician testified that her November 22, 1993 report reflected swelling of the defendant's upper right arm, facial cuts below the left eye and beneath the right eye, swelling of the left eye, a ten centimeter by three centimeter bruise on the lower back, and bruising of the back of face and head. The defendant's sister Ms. Lemon and her friend Jackie Jones also testified to bruises they had seen on defendant on previous occasions.
The trial court stated that there was a lot of evidence that the victim was a bad person, and that it was clear that he was a bad person. The court then stated:
Yet, Miss Scott, we can't just kill people. And this is where my problem comes with all of this, is that even though an individual is a bad person, that does not necessarily mean that we can just kill that person absent either something at the time being done by that individual towards you or absent evidence that that individual has performed or behaved in a fashion so that the individual, you, Miss Scott, isand I'll use this vernacularso full, so full of that individual that you can't do anything else. You can't contain or retain that anymore and it must come out in some fashion. And the way it comes out is by taking that individual's life because of all that that individual has done in the past.
In this particular incident, the victim in this case is, in fact, seated in a vehicle. He's inside of a vehicle at the time he's shot. And you're outside of the vehicle. I accept your explanation or version of this; that is, that therethat inside of that club there was this encounter that happened between you and him inside of the club and that it ended up outside. Yet, my problem comes in terms of why is it that he's killed. Why is it that he's shot at that time? In that, there's just so many other things that could have happened and he would still be alive and you wouldn't be standing there. But you could easily be away from him and he'd be alive and you wouldn't be here. I don't know, Miss Scott, how to divorce myself from those things. I just don't know how to. That man, regardless of the fact that he was who he was, he's dead as a result of your behavior. That's why he's dead.
And, Miss Scott, in all honesty, I just don't think that based on everything that I heard in this case and everything that I was able to observe that the man should have died that night in his automobile. I just don't think so. Is Miss Scott ready for sentence in the matter?
The trial court subsequently admitted that it did not believe that the defendant would commit the crime again, or believe that imprisonment would rehabilitate her. The court said it did not believe the sentence he was imposing on her would have some deterrent on others in the community. *688 Rather, the court stated that it believed she should be punished because she killed someone.
The defendant argues mitigating factors from the now repealed Louisiana Sentencing Guidelines, former La. R.S. 15:325 et seq., repealed by Acts 1995, No. 942, § 3, which are not relevant to this case. The defendant also argues that there are mitigating factors under La. C.Cr.P. art. 894.1 which were present in this case:
(1) 894.1 # 24. The defendant acted under strong provocation-the evidence indicates that the victim had struck the defendant, unless she inflicted injuries upon herself in jail, and she claimed he was going for a gun after having threatened to kill her.
(2) 894.1 # 25. The existence of substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense-the trial court apparently felt that defendant could have extricated herself from the situation without killing the victim, and that the killing was not excusable.
(3) 894.1 # 26. The victim induced or facilitated the crime-the evidence indicates that had the victim not acted as he did the killing would not have happened.
(4) 894.1 # 28. The defendant either had no history of prior delinquency or criminal activity or had led a law-abiding life for a substantial period of time before the crime-defendant was arrested for discharging a firearm into the air fifteen months before the instant offense, was a former drug abuser, and had a 1984 municipal theft conviction and a 1984 arrest for possession of stolen property.
(5) 894.1 # 29. The defendant's criminal conduct is the result of circumstances unlikely to reoccur-there is nothing to suggest that the defendant will kill again.
(6) 894.1 # 30. The defendant is particularly likely to respond affirmatively to probationary treatment-defendant notes that she underwent drug treatment, and claims six years of being drug-free; she claims she was active in her church (she was a member of a church and sought pre-marital counseling with the victim before their marriage); she says she was actively involved in children's school activities, which claim is not supported by the record; and she sought counseling for herself and her children after the incident, which is supported only by her testimony.
(7) 894.1 # 31. The defendant's imprisonment would entail excessive hardship to herself or her dependents-the defendant admits her children would be cared for by her parents, but states they would have a hard time properly caring for them. She states that both children are hemophiliacs. The defendant also claims she will suffer in prison, and that her imprisonment will serve no useful purpose.
In State v. Harris, 97-0300 (La.4/14/98), 711 So.2d 266, the defendant shot and killed her live-in boyfriend, after an argument during which he struck her and pushed her to the floor. After the abuse incident, the defendant walked into another room to get a shirt, but retrieved a gun out of the closet. When the victim came into the room the defendant shot him once from a distance of twenty-five feet. While the defendant testified that she feared the victim had gone into the kitchen to retrieve a knife, no weapon was found near the body. As in the instant case, the defendant was convicted of manslaughter. The trial court believed the killing fell within the category of a second degree murder, and sentenced defendant to seventeen years at hard labor. The claim that the sentence was unconstitutionally excessive was rejected both by the appellate court and Louisiana Supreme Court. State v. Harris, 95 1843 (La.App. 1 Cir. 11/8/96), 684 So.2d 976.
The reasons given by the trial court in the instant case indicate that the court also felt that the case fell within the category of a second degree murder, rather than manslaughter, and did not constitute self-defense. The defendant stood there while the victim went to his vehicle supposedly to get a gun. There were two uniformed police officers on duty inside of the Bottom *689 Line Lounge from which the two had just exited. Yet, rather than retreat back toward the bar, the defendant stood her ground, drew the gun from her purse, and when victim reached toward his dashboard where he supposedly kept a gun, shot and killed him. The record reflects that the trial court considered the mitigating factors of La. C.Cr.P. art. 894.1. Considering the facts and circumstances of this case, it cannot be said that the "5 year sentence," as the defendant refers to it in her brief, was nothing more than the purposeless imposition of pain and suffering, or grossly out of proportion to the severity of the crime.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 9
By this assignment of error, the defendant argues that the cumulative effect of the trial court's errors deprived her of her right to a fair trial. Because there is no merit to the defendant's assignments of error, this assignment has no merit.
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Disagreeing with this court's holding in State v. Bennett, 591 So.2d 783 (La.App. 4 Cir.1991), and stating that, State v. Watley, 301 So.2d 332 (La.1974), cited by the Bennett court for the contrary position, should no longer be regarded as controlling in this regard.
[2] La. C.E. art. 404(A)(2) provides that in a domestic violence situation, a defendant pleading self-defense may introduce evidence of the dangerous character of the victim, including specific instances of conduct and domestic violence. In addition, the defendant may introduce expert opinion testimony "as to the effects of the prior assaultive acts on the accused's state of mind."
[3] Although defendant refers to a paragraph number nine in her brief, a reading of the argument indicates that she is referring to paragraph number eight.