735 So.2d 758 (1999)
STATE of Louisiana
v.
Keith BYES.
No. 97-KA-1876.
Court of Appeal of Louisiana, Fourth Circuit.
April 21, 1999.
*760 Harry F. Connick, District Attorney, Joseph E. Lucore, Assistant District Attorney, New Orleans, Louisiana, Attorneys for Plaintiff-Appellee State Of Louisiana.
Louisiana Appellate Project, Yvonne Chalker, New Orleans, Louisiana, Attorney for Defendant-Appellant Keith Byes.
Court composed of Chief Judge ROBERT J. KLEES, Judge STEVEN R. PLOTKIN, Judge MOON LANDRIEU.
KLEES, Chief Judge.
On June 4, 1987, defendant was indicted on one count of second degree murder, and he pleaded not guilty. On January 20, 1988, he was tried by a twelve-member jury that found him guilty as charged. On January 27, 1988, he was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
Defendant appealed his conviction; and his counsel filed a brief asking for a review for errors patent only. This court affirmed the conviction and sentence in an unpublished opinion. State v. Byes, unpub., 88-KA-1909, (La.App. 4th Cir.1989). Defendant filed an application for post-conviction relief and was granted a new appeal on November 27, 1995. The record was not lodged in this court until August 26, 1997, pursuant to the order of this court in 97-K-0485.
Defendant now appeals on the basis of three assignments of error. We affirm.

STATEMENT OF THE FACTS
The body of Jack Wyman was found in a ditch near the intersection of Adrian and Nathaniel Streets in an area of Algiers known as the "Cutoff" on April 6, 1987. Several of the victim's possessions and two *761 spent .38 caliber casings were found near the body. The victim's father, Wes Wyman, testified that the day before had been his son's birthday and that he had given him a watch that morning. Mr. Wyman further testified that his son had a full day of classes at Delgado and that when Jack did not return home that night, he was not concerned. On the afternoon of April 7, Mr. Wyman testified that he received a telephone call from an unidentified person who told him that his son's car was at 6912 Tullis Drive. He went to that address and found his son's car parked in the carport of an abandoned house. He did not find anything unusual about the car at that time, although he found a spent cartridge shell in the car. He went home and called the police. The police officer arrived at his home and then the officer received a call that a body had been found in the Cutoff area, which was near where Jack's car had been left. After going to the scene and identifying the body as that of his son, Mr. Wyman and the police went to 6912 Tullis; but, when they got there, the car was gone. They found the car's floor mats in a shed behind the house, and the mats had blood on them.
Officer Byron Adams testified that the police developed defendant as a suspect and that at approximately 11:40 p.m. on April 7, defendant was placed under arrest. Adams testified that both he and Detective Jacklean Davis advised defendant of his Miranda rights and that defendant gave an unrecorded statement. In this statement, defendant told the police that he was standing at the corner of Simpson and General Meyer when he saw Jack Wyman and Mike Duke in Wyman's car. Defendant stated that Wyman called him over to the car and said that he wanted to buy a joint. Defendant further stated that he got into the car with Wyman and Duke and that they drove around snorting cocaine. Defendant said that after several hours, Duke demanded five hundred dollars from Wyman for the cocaine and that Wyman refused to pay for it. Defendant stated that Wyman then drove to the wooded area near Adrian and Nathaniel and pulled out a gun, which Duke grabbed. Defendant further stated that Wyman and Duke struggled over the gun and he got out of the car. As he ran from the scene, he heard a shot. Defendant said that he went to his house and that about fifteen minutes later, Duke came to his house in Wyman's car. Defendant further stated that Duke said that he had killed Wyman and had thrown his body in a ditch. Duke then gave defendant Wyman's watch and gun, which defendant said that he took to the Fischer Housing Project. Defendant stated that he met a person named "Red" and that he swapped the gun for a bag of marijuana and a .25 caliber automatic. Defendant further stated that he met another person who was nicknamed "Lump" and that he gave the watch to Lump in exchange for ten "clickums" and six dollars.
After hearing this statement, Adams had defendant show him where Red and Lump lived. After pointing to a building in the 1400 block of Wall, defendant admitted that he really did not know where Red lived. They then went to the 2500 block of Whitney, where defendant said that Lump lived; but, defendant again admitted that he was not sure of the apartment but could point out Lump's car. Defendant pointed out an Oldsmobile as being Lump's car; but, when the police checked the car's registration, it was shown as being from Texas. Adams testified that he confronted defendant and told him that he was lying. Defendant then stated that he had accidentally killed Wyman.
Defendant signed a waiver of rights form and gave a second statement that was recorded. In the second statement, defendant stated that Wyman picked him up at the corner of General Meyer and Bennett and that Wyman wanted to buy some valiums. Defendant stated that they went to Lancaster Street where they got into an argument when Wyman refused to give him money to pay for the valiums. *762 Defendant further stated that Wyman refused to give him the money because Wyman said that defendant owed it to him. Defendant said that Wyman had a gun on the seat of the car and that he and Wyman fought over the gun. Defendant then said that he got the gun and shot Wyman. After shooting Wyman, defendant took the gun and hid it under some bricks at the corner of General Meyer and Pittari. He then went back, got the car, disposed of Wyman's body, and hid the car in the woods. He admitted going through Wyman's things and taking his watch, camera, and six dollars. The next day, defendant said that he moved the car to a driveway on Tullis. He further stated that he got the gun, which he said was a .357 caliber revolver, and exchanged it for a .25 caliber automatic and a bag of marijuana. He also said that he sold the watch to a drug dealer named "Lump" who lived in an apartment complex behind the Wendy's on General De Gaulle. Defendant additionally stated that he threw Wyman's leather coat into the drain in front of his house and Wyman's keys into the drain on Pittari. Defendant said that Wyman's camera was at his house.
Dr. Paul McGarry performed the autopsy on Jack Wyman. He stated that Wyman had been shot four times and that three of the shots came from the rear. He said that one shot entered one and one-half inches to the right of the angle of Wyman's mouth and cheek and that this bullet traveled to the back and downward into Wyman's neck. He said that the gun was fired very close to Wyman's face, but he also said that this shot would have been fatal. He further found two parallel wounds behind the right shoulder that traveled downward toward the center of the body. One bullet went through the heart and into the lung, while the other went through the diaphragm into the liver and lower abdomen. He said that either one of these shots would have been fatal and would have made it unlikely for Wyman to do anything. The fourth shot entered Wyman's right forearm. McGarry further stated that Wyman had a blood alcohol level of .16 and that he tested negative for cocaine. He opined that the angle of the wounds indicated that Wyman was turning away when he was shot.
Detective Jacklean Davis testified that after the statement was taken from defendant, she went to his home and asked defendant's mother if he had a compact camera in his possession. Davis further testified that defendant's mother said that she did not know if defendant did, but that she would have defendant's twin brother check defendant's room. Davis stated that the brother returned to the door and handed her a camera. She also testified that she called the Sewerage and Water Board to open the drain in front of defendant's home where Wyman's leather jacket was found. She additionally had the Sewerage and Water Board open the drain on Pittari Street where Wyman's keys were found.
Defendant testified that he had known Jack Wyman since high school and that on the night of April 6, he was shooting pool when someone told him that Wyman was outside looking for him. Defendant further testified that Wyman asked him if he could get some valiums, and defendant told Wyman that he could. Defendant said that he got into Wyman's car and that they went to Lancaster Street to see a handicapped man named Herb to buy twenty valiums. Defendant testified that when he went back to the car to get the money to pay for the drugs, Wyman refused to do so and pulled out a gun after words were exchanged. Defendant stated that he rushed at Wyman and grabbed the gun, which he said went off twice. Defendant then stated that when he tried to get out of the car, Wyman made some sort of motion with his arm and that the gun went off again for a total of three or four times. He said that he ran off and hid the gun under some bricks on Pittari Street. He denied moving the car and did not know who did so, and he also denied taking any of Wyman's possessions. Defendant further *763 testified that he did not make the first statement to the police, but later admitted that the police had twisted around what he had initially told them. As to the recorded statement, defendant testified that he did not give certain information that was contained in the statement; and after stating that Adams turned the tape recorder off and on while he gave the statement, he testified that he was not sure if it was on or off when he made certain statements. He also testified that he had smoked two or three clickums on the night of the shooting and that he had smoked five or six clickums before he was arrested and gave his statement. He denied having taken Wyman's camera, but he could not explain why his mother had the camera. He testified that he was afraid of being shot by Wyman when the altercation began. On cross-examination, defendant stated that it did not sound like his voice on the recorded statement, but he admitted that it was his signature on the waiver of rights form. As to the shooting itself, defendant admitted that his finger was on the trigger of the gun; and, he further stated that the gun would not stop "clicking."
Nancy Evans testified that she lived at 2943 Lancaster and that she had known defendant for eleven years. She was looking out of her window when she saw the car pull up. She then heard her daughters, who were outside standing at the corner, hollering. She looked out of the window and saw defendant getting up from the ground from the passenger side of the car. She testified that she then heard shots and saw defendant shoot the gun. She said that when defendant shot a second time he was running away. Ms. Evans testified that she went outside and saw defendant, whom she called "Twin," walking by. She asked him what happened, and he told her, "He tried to kill me." Ms. Evans went back inside; and, when she looked out her bedroom window, the car was gone. She went to a neighborhood club where she saw defendant. She again asked him what happened, and he told her that he had gotten into a fight and was hit in the mouth with the gun.

DISCUSSION

ERRORS PATENT
A review of the record shows no errors patent.

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, defendant complains that the evidence was insufficient to support a conviction for second degree murder. He argues that the evidence showed either that he acted in self-defense or that the homicide was a manslaughter.
The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier fact could have found the essential elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Rosiere, 488 So.2d 965 (La.1986). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La.1988). Additionally, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Id. The trier of fact's determination of credibility is not to be disturbed on appeal absent an abuse of discretion. State v. Cashen, 544 So.2d 1268 (La.App. 4th Cir.1989).
Second degree murder is the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(1). A homicide is justifiable if committed by one in defense of himself when he reasonably believes that he is in imminent danger of being killed or of receiving great bodily *764 harm and that the homicide is necessary to save himself from that danger. La. R.S. 14:20(1). When a defendant claims self-defense, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. State v. Lynch, 436 So.2d 567 (La.1983); State v. Brumfield, 93-2404 (La.App. 4th Cir. 6/15/94), 639 So.2d 312. Regarding self-defense, it is necessary to consider whether the defendant had a reasonable belief that he was in imminent danger of losing his life or receiving great bodily harm and whether the killing was necessary under the circumstances to save the defendant from that danger. State v. Dozier, 553 So.2d 911 (La.App. 4th Cir.1989), writ denied 558 So.2d 568 (La.1990). Although there is no unqualified duty to retreat, the possibility of escape is a factor in determining whether or not the defendant had a reasonable belief that deadly force was necessary to avoid the danger. Id. However, a defendant who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that the defendant desires to withdraw and discontinue the conflict. La. R.S. 14:21.
The State presented sufficient evidence that defendant did not act in self-defense when he shot and killed Wyman. As shown by defendant's own testimony, there was only one gun in the car; and he admitted that he alone had his finger on the trigger. The victim sustained two shots in the back and one in the side of his face. Also, the testimony of Nancy Evans shows that defendant continued shooting even after he got out of the car. Moreover, the jury must have disbelieved defendant's own testimony considering the inconsistencies between it and his earlier statement; and, this credibility determination is not an abuse of discretion.
Defendant next argues that if the evidence did not show that he acted in self-defense, it does support a verdict of manslaughter. Manslaughter is a homicide which would be either first or second degree murder, but the killing is committed in "sudden passion or heat of blood caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La. R.S. 14:31(A)(1). "Sudden passion" and "heat of blood" are not separate elements of the offense but are mitigating factors that exhibit a degree of culpability less than that present when the homicide is committed without them. State v. Lombard, 486 So.2d 106 (La.1986). Because they are mitigating factors, the defendant must establish them by a preponderance of the evidence. State v. Heck, 560 So.2d 611 (La.App. 4th Cir.1990), writ denied 566 So.2d 395 (La.1990).
Defendant did not establish by a preponderance of the evidence that the killing of Wyman was committed in "sudden passion" or "heat of blood." The only evidence of provocation came from defendant himself, and the jury, in finding him guilty of second degree murder, must not have found his testimony as to what transpired between him and Wyman to be credible. We fail to find this credibility determination to be an abuse of discretion. Accordingly, this assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, defendant complains that his right to appeal was impaired because the transcript from the hearing held on his motion to suppress the confession and the evidence could not be located. The record contains a certificate, dated March 10, 1998, from the court reporter that after making a diligent effort to locate his stenographic notes and audio recordings for September 8, 1987, the date of the motion hearing, he was unsuccessful and therefore unable to produce a transcript of the motion hearing.
Under Article 1, § 19 of the Louisiana Constitution, a person is entitled to judicial review based upon a complete record of all *765 evidence upon which the judgment is based. In State v. Archie, 462 So.2d 248 (La.App. 4th Cir.1984), the appeal record did not contain portions of the motion to suppress hearing transcript because it had been lost. This court stated that this circumstance did not warrant vacating the conviction and sentence and that all that was required was for the trial court to conduct another hearing on the motion to suppress and act on the motion. But in State v. Vaughn, 378 So.2d 905 (La.1979), portions of the testimony from the defendant's motion to suppress the identification were not transcribed because of a malfunction in the recording equipment. On appeal, the Supreme Court stated that the missing testimony was hardly relevant or material to the issue presented by the motion to suppress; but, the court further noted that in determining the correctness of a ruling on a pretrial motion to suppress, it was not limited to the evidence presented at the hearing on that motion, but could consider all pertinent evidence adduced at the trial on the merits.
In the present case, the only witness who testified at the motion to suppress hearing was Officer Byron Adams, who also testified at trial. At trial, he gave extensive testimony about the circumstances surrounding the statements made by defendant. As noted below in the discussion of Assignment of Error No. 3, there is no showing that the trial court erred in denying the motion to suppress the confession. Detective Jacklean Davis testified about the seizure of the camera from defendant's home, which occurred after defendant's mother and brother found the camera and gave it to her. Considering this testimony in the record, we fail to find that defendant has been deprived of his right to full judicial review of his conviction.

ASSIGNMENT OF ERROR NO. 3
In his third assignment of error, defendant complains that the trial court erred in denying his motion to suppress the confession. He argues that his consumption of five to six PCP-laced marijuana cigarettes prior to the statement showed that he was unable to comprehend fully the rights he was waiving or that he made a knowing and intelligent waiver of those rights. He further argues that threats and promises of leniency from Officer Adams show that the statement was not freely and voluntarily given. He also asserts that it is apparent from the statement itself that Officer Adams prodded, prompted and coached defendant in order to get the responses he wanted from defendant.
The State bears the burden of proving beyond a reasonable doubt that a statement given by a defendant was voluntary and was not influenced by fear, duress, intimidation, menaces, threats, inducements, or promises. State v. Bourque, 622 So.2d 198 (La.1993). The State must prove that the accused was advised of his/her Miranda rights and voluntarily waived these rights in order to establish the admissibility of a statement made during custodial interrogation. State v. Labostrie, 96-2003 (La.App. 4th Cir. 11/19/97), 702 So.2d 1194, writ denied, 98-0250 (La.6/26/98), 719 So.2d 1048. An express written or oral waiver of rights is strong proof of the validity of the waiver. Id. Whether a statement is voluntary is a fact question; thus, the trial judge's ruling, based on conclusions of credibility and the weight of the testimony, is entitled to great deference and will not be disturbed on appeal unless there is no evidence to support the ruling. Id.
The trial court did not err in denying defendant's motion to suppress the confession. The transcribed statement shows that defendant was advised of his Miranda rights at the outset and that defendant admitted signing a waiver of rights form. The statement also shows that defendant was asked whether any promises, threats, or force had been used to make him give the statement, and defendant denied that they had. At trial, Adams denied that he threatened or coerced defendant or that any promises were made. A review of the statement does not support the assertion *766 that Officer Adams prodded, prompted, or coached defendant to get desired responses during the course of the interrogation; and, defendant does not point to any specific instance of any such mode of questioning by Adams.
As to defendant's claim of impairment or intoxication, the record shows that defendant was arrested at 11:40 p.m. on April 7 and that the statement was taken at 3:07 a.m. on April 8, over three hours after the arrest. Defendant did not state when he last smoked a "clickum" or over what period of time he smoked them prior to his arrest. Defendant testified that "clickums" made him both "woozie" and "wide awoke." He also admitted that they made him kind of incoherent, but not mean or violent. Defendant was asked if he knew what he was giving up by making his statement, and defendant answered in the affirmative. Considering that defendant did not testify that he did not understand what rights he was waiving, there is no basis for concluding that he was too intoxicated or impaired to make a knowing and intelligent waiver of his constitutional rights. This assignment of error is without merit.

CONCLUSION
Accordingly, defendant's conviction and sentence are affirmed.
AFFIRMED.