JjMICHAEL E. KIRBY, Judge.

STATEMENT OF THE CASE

Defendant James Taylor was charged by grand jury indictment on June 8, 2000 with second degree murder, a violation of La. R.S. 14:80.1. He was jointly indicted with Thea M. Williams, who was charged with second degree murder and accessory after the fact.[1] Defendant pleaded not guilty at his June 14, 2000 arraignment. The trial court denied defendant’s motion to suppress on April 6, 2001. On June 15, 2001, the trial court granted codefendant Williams’ oral motion for severance, over the objection of defendant. The trial court granted codefendant Williams’ written motion to sever on July 20, 2001. The trial court denied defendant’s motion to suppress the evidence on September 5, 200Í, immediately prior to the commencement of trial. On September 5, 2001, this court denied defendant’s writ application as to the denial of his motion to suppress the evidence.[2] Defendant was found guilty as charged by a twelve-person jury on September 6, 2001. On February 15, 2002, the trial court denied defendant’s motion for new trial. Defendant waived sentencing delays and was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension | ¡>pf sentence. The trial court granted defendant’s motion for appeal on that same date.

FACTS

Louise Ray, mother of victim Walter Ray, identified a photograph of her son, who died on April 14, 2000 at age thirty-six.
Dr. Richard Tracey, qualified by stipulation as an expert in forensic pathology, testified the victim was shot three times. Two wounds were superficial; a third went through the heart. Dr. Tracey could not tell the sequence' of the wounds. One bullet entered the mid-chest and traveled left, breaking some ribs but failing to penetrate into the body. This entrance wound had a contact mark on it, indicating that the muzzle of the gun was against the skin when fired. A second bullet entered near the right armpit, passed through the lung, the heart, and the other lung. This was the fatal wound. A third bullet went through the skin and muscle of the right shoulder, ending against the right shoulder blade. Dr. Tracey confirmed that this wound probably would have slowed down the victim’s use of his right arm. There was no indication of “stippling,” or powder burn marks, around either the second or third wounds. Dr. Tracey explained that most firearms leave powder marks when fired within 12-18 inches, and that he would not expect a T-shirt to fully intercept the powder. Dr. Tracey said he would not expect either of the two nonfatal shots to cause the victim to drop or be taken down immediately. When asked whether the other shot would be a “knockdown shot,” Dr. Tracy said simply that it was the one that killed him.
*10 The victim was 5'7" tall, and weighed 205 lbs. Dr. Tracey described the victim as well-built, “pumped up,” confirming that the victim’s physique was like |3a body builder’s. His liver had a peculiar appearance associated with bodybuilding steroid use. The victim had a couple of minor scratches and scrapes — on his right upper eyelid and back. The scratches on the back could be consistent with the victim falling on his back. A toxicology report confirmed the presence of cannabinoids in the victim’s system. Dr. Tracey also said the first wound would have bled and if the victim moved from one place to another he would have left a trail of blood. However, questioned about the possibility of clothing absorbing some of the blood, he qualified his answer by saying that he would expect to see a trail of blood, but was not saying that it necessarily had to be there.
Sometime after 2:40 p.m. New Orleans Police Officer Patrick Smith responded to the shooting at a Texaco gas station located at 2946 Gentilly Blvd. He secured the crime scene. The officer identified photographs of the scene. No weapons were around the victim.
New Orleans Police Department Crime Lab technician Terese Smith prepared the crime scene report in the instant case. She took photographs, dusted for fingerprints and collected physical evidence. Collected at the scene were a yellow metal medallion and chain, the victim’s torn, bloodstained T-shirt and a City of New Orleans payroll check. She collected three blood samples. Ms. Smith said she did not collect blood from the front of the store.
Crime Lab technician Officer Millard Green drew diagrams of the scene which showed two bloodstains in the store. One was some fourteen feet six inches into the store from the entrance, the second some fifteen feet two inches from the entrance, and five feet eight inches to the left from the first.
New Orleans Police Officer Kenneth Leary Jr., was stipulated to be an expert in the identification and testing of firearms and ballistics training. He [ testified that all three bullets identified as recovered from the body of the victim had been fired from the same .380 caliber firearm.
Willie Shields, the victim and the defendant were all employed by the City of New Orleans Parks & Parkway Commission on the day of the shooting. Shortly after 7:00 a.m. that day Mr. Shields witnessed an on-the-job altercation between the victim and defendant while the employees were signing their time cards. A fight erupted between the defendant and the victim when the defendant accused the victim of snatching a pen from him. None of the onlookers did anything until the victim got defendant down, whereupon Mr. Shields grabbed the victim. Another worker helped him pull the victim up, breaking up the fight. Mr. Shields saw no weapons. A security guard took the victim somewhere, and Mr. Shields noticed that defendant had gone outside and was sitting down holding his face. Defendant and the victim were subsequently sent home. Mr. Shields described the victim as kind of heavy, with a stocky build. Mr. Shields did not know who threw the first punch, but confirmed that the victim was “whipping up” on defendant at the point he and the other worker intervened to pull the victim off.
New Orleans Police dispatcher Jocelyn Payne identified a document reflecting a 911 call about a shooting that was received on April 14, 2000, from 2946 Gentilly Boulevard.
Former New Orleans Police Detective Christopher Burkhart was the primary homicide investigator on the case. He saw no blood at the entrance to the store. All *11 three blood samples that were marked and collected were towards the rear of the store. He replied negatively when asked on direct examination whether there was any blood right by the front door of the gas station convenience store. He conceded on cross examination that the police diagrams showed blood at the front | ¡¡door and at the back door. He confirmed that this was a mistake. The store’s video surveillance camera was not functioning at the time of the shooting. Police were given the license plate number of the vehicle in which the male shooter and a female left the scene. Mr. Burkhart interviewed Om-ari Prince, Patina Batiste, Ahmad Duples-is, Abba McBay and Lonnie Banks, the latter being an employee of the Texaco gas station. Mr. Prince and Ms. Batiste both identified defendant in photograph lineups. The victim’s vehicle was at the scene, parked by the first gas pump. Ms. Batiste had been in the company of the victim. No weapons were located in the victim’s vehicle or around where the victim had fallen after being fatally shot. The victim had been taken from the scene by EMS personnel before Mr. Burkhart arrived.
Lieutenant Steven Gordon, Assistant Commander of the New Orleans Police Department’s 911 Communications Division, testified that he was the custodian of records for the complaint history and the tape of the 911 call made in connection with the shooting in the instant case. The tape was played for the jury.
Ahmad Duplessis admitted having two prior convictions for possession of heroin, from November 2000 and March 2001. On the day of the shooting he was living in an apartment across the street from the Texaco station. He went to the station on that date and encountered the victim, whom he recognized from the area. The victim told Mr. Duplessis about the altercation with defendant. They were standing in line at the counter. The victim pointed out defendant, who was outside with a female at a gas pump. Defendant’s female companion subsequently exited the vehicle, entered the store, and verbally attacked the victim, putting her finger in the victim’s face and telling him he was a coward. Mr. Duplessis said the victim told the female that it was over with, to forget about it, and to leave before | ^anything else happened. Seconds later defendant got out of the car and walked into the store. Defendant’s companion turned around to see defendant with a gun in his hand, at which point she implored him to stop. Mr. Duplessis said that before he knew it he heard gunshots, whereupon he ducked behind one of the shelves and ran toward the back and into a rear storage area. Mr. Duplessis admitted that his memory was kind of foggy, but said he saw the gun pointed at the victim, and turned away before hearing the gunshots.
Mr. Duplessis acknowledged on cross examination that the victim was heavyset. He admitted that he did not know what happened after he turned away and ducked after seeing the gun. Mr. Du-plessis also confirmed that the victim’s girlfriend was outside when all of this occurred. Mr. Duplessis replied affirmatively when asked whether, when he came upon the victim outside the store, there was already a verbal altercation in progress between the victim and defendant’s female companion in the gas pump area. This contradicted Mr. Duplessis’ earlier testimony. Mr. Duplessis further confirmed on cross examination that there were curse words flying back and forth between the victim and defendant’s female companion, but said it was primarily the female. The argument escalated after the victim, the woman and Mr. Duplessis entered the store. The victim was in a line at a check-cashing booth, but was actually in front of the checkout counter, *12 which was located near the check-cashing booth. The victim was facing the front of the store. Defendant’s female companion was in front of and facing the victim. After the shooting, Mr. Duplessis saw the victim lying in the back aisle.
On redirect examination Mr. Duplessis stated that he never saw the victim attempt to draw a weapon, saw a gun on the victim, or saw a gun on the scene after l7the shooting. He also confirmed on redirect that defendant’s female companion was primarily the one making all the threats.
Lonnie Banks was working as a cashier at the Texaco gas station at the time of the shooting. She was behind the checkout counter at the front of the store. Ms. Banks said the victim came in almost every Friday to cash his check. When the victim entered on that Friday afternoon he wished Ms. Banks a good evening. There were approximately five to six others in line at the check-cashing booth, but no one was in line at the checkout counter. Defendant’s female companion entered, purchased $10.00 worth of gas, then left to go pump the gas into her white Cadillac. She subsequently drove around and parked, and came back into the store yelling obscenities at the victim. The victim told the female that it was finished. The female was waving her hands. Defendant rushed in. Ms. Banks said she did not see defendant’s face, only a white T-shirt. She heard scuffling and three or four shots, had ducked down to the floor when the shots started. Ms. Banks did not hear the victim engage the female or anyone else in a verbal altercation. She did not see whether the victim was armed with any type of weapon. Ms. Banks came out after the shooting to see if she could help the victim, who was lying not too far away from the check-cashing booth. Defendant and his female companion left, with the female pulling defendant and telling him “come on.” The female drove off down Touro Street with defendant in the passenger seat.
Ms. Banks said on cross examination that the victim had been in the store approximately five minutes before defendant’s female companion entered to pay for her gas. She did not tell this to police when giving her statement because they did not ask her about it. Ms. Banks was certain there was a scuffle between defendant and the victim because she heard it. She heard the victim say “it don’t |Rhave to be this” before the shots rang out. Ms. Banks was confronted with her statement to police in which she stated that she heard somebody say that, but did not say that it was the victim who said it. She explained that when she gave her statement she was tired from and disgusted about the shooting. Ms. Banks said the victim had a nice disposition and personality, and she would notice him joking in line with other guys from work. She could not pick anyone out of the photo lineup police displayed to her.
Omari Prince testified that he walked to the Texaco station/store to cash his income tax refund check at approximately 2:85 p.m. on April 14, 2000. He was standing behind the victim in the line at the check-cashing booth. One person was ahead of the victim. The victim was talking to the person in front of him, expressing disbelief that a woman outside he did not know accused him of calling her a bitch. The woman entered the store and berated the victim, asking why he called her a bitch. Mr. Prince said the victim was telling her he did not, that he had no idea who she was, that he apologized, and to please leave him alone. The victim did not threaten the woman or do anything that might have been threatening. The woman told the victim she had ten brothers who *13 were going to come in and kick his ass. The woman left and returned, walking in side-by-side with defendant. The victim asked defendant: “What are you going to do, shoot me?” Defendant pulled a gun from beneath his shirt and started shooting. After the first shot, Mr. Prince and other bystanders ran back toward a freezer. Mr. Prince replied negatively when asked whether at any time the victim did anything to threaten defendant. He subsequently identified defendant in a photo lineup and in court.
[sMr. Prince confirmed that the victim was hit with at least the first shot while standing approximately five feet away from him. He confirmed on redirect examination that he was positive the victim was in the back of the store when shot. He did not recall seeing any blood in the doorway.
Patina Battiste testified that the victim returned home from work only ten minutes after he left, appearing worried. The two left the house later in the day when the victim drove Ms. Battiste to her job. She had to be there by 3:00 p.m. The victim stopped at the Parkway & Parks Commission to pick up his check, and then drove to the Texaco station to cash it. They parked on the side of a gas pump, and the victim entered the store. A car driven by a female, with a male passenger, pulled up beside Ms. Battiste, who was seated in the passenger seat of her vehicle. The occupants stared at her. When the victim came out he asked the occupants if they knew Ms. Battiste, and he and the female began fussing. Ms. Battiste implored the victim to cash his check so they could leave. The vehicle drove off and the victim went inside. A couple of seconds later, Ms. Battiste observed the female who had been in the other vehicle walk inside the store. Ms. Battiste followed finding the victim and the female arguing. She said they both apologized, and the next thing Ms. Battiste knew she was pushed out of the way and she heard gunshots. She replied negatively when asked whether she saw the victim act like he was going to draw a gun or do anything to provoke the shooting. She never heard anyone warn the victim to get away from the other woman or say “don’t do that, I have a gun.” The victim’s body was between the aisles. She identified defendant in a photo lineup shown to her by police.
Ms. Battiste confirmed that the victim was muscular and strong, but she did not know whether he worked out or lifted weights.
| inDefendant, fifty-years old at the time of trial, testified in his own defense. He had known the victim for two years at the Parkway & Parks Commission. Defendant was a driver and foreman of the crew. The victim was a laborer on the crew. The two were friends at one time, but defendant eventually asked a supervisor to transfer the victim to another crew because he would not follow instructions. From that point on defendant asserted the victim carried a chip on his shoulder toward him. Defendant said he tried to stay away from the victim. Defendant claimed that the victim once falsely reported he had stolen some equipment.
On the day of shooting, a supervisor had given defendant his pen to sign his time-card. The victim snatched the pen out of his hand, and when defendant tried to retrieve it, the victim punched him in his jaw. Defendant then threw a cup of coffee on the victim, and in doing so slipped and fell. At that point the victim started beating up on him, and had to be pulled off. The two men were suspended that day. As defendant was leaving, the victim told him that he had “f-with” the wrong person, and that it wasn’t over with yet. Defendant went home.
*14 Defendant said the Parkway & Parks Commission paychecks were ready around 2:00 p.m. Defendant asked “Thea,” the mother of his two children, to give him a ride to pick up his check before the victim got there. They stopped to get gas and water for the radiator. Thea went inside to pay for her gas, while defendant put water in the ear. Thea came and pumped her gas. The victim arrived after Thea pumped the gas. There was no doubt in defendant’s mind that they were at the gas station before the victim and Ms. Battiste pulled up at the other gas pump. Defendant said that when he made eye contact with the victim and Ms. Battiste, the victim said, “Bitch, what you looking at.” The victim then exited his car, walked In around to the passenger side of his car, and said: “What’s up? What’s up? You ready to die? Because somebody going to die today?” The victim reached down into his car, then stood up and walked into the gas station. While walking into the gas station, Thea asked the victim why he wanted to kill her.
Thea and the victim both ended up inside the gas station. Defendant could see them inside the store pointing at each other. Defendant thought he should go inside to get Thea before the victim did something to her. They were still at it when he walked in. Defendant claimed he had walked only three steps into the store when the victim grabbed him around his shoulder and was all over him. He struggled with the victim, but could not free himself. Defendant said he feared for his life, and pulled the gun from his waistband and shot the victim. Defendant claimed the victim kept coming, and he fired three times before the victim weakened and fell in the aisle. Defendant said all of the shots were in body contact. Defendant said Ms. Battiste was not in the store. The only person he remembered being there was Thea. He did not see a woman behind the counter or anyone standing in line, because the victim attacked him when he walked in the door. Defendant said that after the shooting he was scared and he and Thea fled. She drove three blocks away before defendant told her to let him' out. He walked home, disposing the gun in a trash can. Defendant said he surrendered after hearing police were looking for him.
Defendant said he has never been convicted of a crime, and that the photo of him police included in the photo identification lineup was his driver’s license photo. Defendant was remorseful. He said he did his best to avoid the victim that day after the fight at work. Defendant admitted he was carrying a pistol when he went into the store. He claimed he had been robbed of his paycheck. Because he |12drove the work truck, he would stop off at his home every Friday while at work, pick up his gun, and put it in his tote bag, for protection. Defendant replied negatively when asked whether there was anything he could have done to get the victim off of him, saying he was no match for the victim physically, who overpowered him.
Defendant said on cross examination that on this particular Friday he was not carrying his pistol in his tote bag as he usually did. He put it in his waistband, underneath his shirt. He had it on his person while he was in the car, and when he was with Thea at the Texaco station. He threw the gun away after the shooting because he was scared. Defendant replied negatively when asked whether he was ever irritated with the victim. He found humor in the victim’s attempt to turn fellow workers against him. He was afraid of the victim because the victim was a violent person. He first said he was not afraid of the victim at work, but later said he was, “all the time.” Defendant claimed he did not get mad when the victim *15 snatched the pen out of his hand at work. He thought the victim broke his jaw when he punched him at work that day, and he was beaten up.
Defendant was asked about the encounter later that day at the Texaco station. He replied affirmatively when asked whether the victim yelled at him across the gas station outside when he called him a bitch and asked him if he was ready to die. After defendant grabbed him inside the store, they struggled. He- said the victim was trying to push him to the ground. The victim kept coming after he fired the first shot into him. Defendant did not see the victim with a weapon, but did not know what the victim removed from his car when he reached down into it before entering the store. He denied being angry at the victim.
113Pefendant said on redirect examination that he did nothing at all to engage the victim at the gas station. The only thing he wanted to do when he entered the gas station store was to get Thea. He did not go inside intending to shoot the victim. The victim did not get off of him after the first or the second shot; only after the third and final shot did the victim back up and fall.

ERRORS PATENT

A review of the record reveals no patent errors.

ASSIGNMENT OF ERROR NO. 1

Defendant first argues that the trial court erred in granting his codefend-ant’s motion to sever, and in subsequently permitting the State to try defendant first. These are two separate issues.
Thea Williams was jointly indicted with defendant for the second degree murder of the victim, and was additionally charged as an accessory after the fact. A June 15, 2001 minute entry reflects that Ms. Williams’ counsel orally moved for severance at a pretrial appearance on that date, and that the trial court granted the motion over the objection of defendant. The record also contains a written motion to sever filed by Ms. Williams on July 20, 2001, which motion was granted by the court on that same date.
The issue of severance was first broached at an April 6, 2001 motion hearing. The State noted that this would be a Bruton[3] severance issue. The trial 114court then asked the State whether it was going to try defendant first, and the State replied that it was. Counsel for defendant noted that he had not moved for a severance. The State noted that counsel for Ms. Williams had notified it that he intended to file a motion to sever. Counsel for defendant questioned whether Ms. Williams had standing to seek a severance, asserting that she had given the statement upon which the severance would be granted. Counsel for defendant suggested that defendant was the only one who could move for a severance. Counsel indicated that he just wanted to be on the record about the issue. This exchange arguably might be considered an objection on the part of defendant to Ms. Williams seeking a severance. However, counsel for defendant voiced no objection to the State’s plan to try defendant first, should the severance be granted.
As noted, the minute entry from June 21, 2001 indicates that defendant objected to the trial court granting defendant’s oral motion to sever. There was no objection noted as to any plan by the State to try defendant first. The record contains no *16 objection to defendant’s July 2001 written motion to sever. After the close of the State’s case in chief at trial, and after defendant testified in his own behalf, counsel for defendant stated that if Ms. Williams had gone to .trial first, and had been acquitted, then she would “be a possible witness” for defendant and would be of a significant benefit to him. Counsel stated that because the State elected to try defendant first, Ms. Williams had a Fifth Amendment right not to testify, and that in fact Ms. Williams’ counsel had informed him that she would invoke that right if she was called to testify. Counsel for Ms. Williams informed the court that she had informed her client to invoke her Fifth Amendment right if called as witness. Counsel for defendant then successfully moved the court to permit him to have Ms. Williams simply come into the court in the presence of the |irjury and be identified. At no time did counsel for defendant object that the State had improperly used its authority to try defendant first, or that the trial court had erred in permitting the State to try defendant first. Further, even assuming this was an objection to the State electing to try defendant, before Ms. Williams, it was not contemporaneous.
A defendant cannot avail himself of an alleged error unless he made a contemporaneous objection at the time of the error. La.C.Cr.P. art. 841(A); State v. Spain, 99-1956, p. 11 (La.App. 4 Cir. 3/15/00), 757 So.2d 879, 886. Not only does an objection have to be made, but La.C.Cr.P. art. 841(A) requires that a defendant'make known the grounds for his objection, and he is limited on appeal to those grounds articulated at trial. State v. Brooks, 98-0693, p. 9 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 819; State v. Buffington, 97-2423, p. 9 (La.App. 4 Cir. 2/17/99), 731 So.2d 340, 346.
The record does not reflect that defendant objected to the State electing to try defendant first, even though defendant knew as early as April 6, 2001 that it intended to do so. Even assuming defendant effectively objected after the close of the State’s case in chief, after he testified on his own behalf, such objection was not contemporaneous. Accordingly, defendant cannot raise any error on appeal with regard to the State trying defendant first.
As to ' the severance itself, La. C.Cr.P. art. 704 states that jointly indicted defendants shall be tried jointly unless the State elects to try them separately, or the court, on motion of the defendant, is satisfied that justice requires a severance. The grant or denial of a severance is within the sound discretion of the trial court, whose decision will not be disturbed absent clear abuse. State v. Prudholm, 446 So.2d 729, 741 (La.1984); State v. Burton, 96-1248, p. 11 (La.App. 4 Cir. 12/9/98), 727 So.2d 518, 523.
Ms. Williams represented in her written motion to sever that defendant James Taylor had made an inculpatory statement in the presence of an assistant district attorney, which statement contained exculpatory information as to her. She represented that she required the exculpatory testimony of defendant. Ms. Williams’ attorney executed an affidavit attesting that defendant had made a number of statements exculpating Ms. Williams, and had stated unequivocally that she had nothing to do with the shooting. Counsel for Ms. Williams represented that defendant stated that he would testify at a joint trial, but counsel stressed that defendant had the right not to testify. Counsel concluded by stating that unless Ms. Williams’ was severed from defendant and defendant tried first, she would likely be precluded from presenting significant exculpatory evidence, and Ms. Williams would be denied *17 her right to a fair trial and her right to present a defense.
In State v. Joseph, 619 So.2d 1229 (La.App. 3 Cir.1993), twit granted in part on other grounds, 629 So.2d 360 (La.1993), the trial court granted the State’s motion to sever two codefendants on the morning of trial. The severed codefendant subsequently asserted his Fifth Amendment privilege and refused to testify at the defendant’s trial. The defendant was found guilty as charged of simple arson. On appeal, defendant claimed the trial court erred in granting the State’s motion to sever. He argued that the defense strategy had been to give joint testimony to corroborate and amplify the defendant’s statement that a third person started the fire, and that the severance made it impossible for him to do that. The appellate court rejected that argument, reasoning that the codefendant could have refused to testify even had the case not been severed.
| ^Considering the reasons set forth in Ms. Williams’ motion to sever, including the representations in counsel’s affidavit attached thereto, and the fact that a joint trial did not guarantee that Ms. Williams would have testified, it cannot be said that the trial court clearly abused its discretion in granting the motion to sever.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2

In this assignment of error, which is actually four separate but related assignments, defendant claims that the trial court erred (1) in denying his challenge for cause of a prospective juror; (2) in permitting the State to misstate the law as to self-defense during voir dire; (3) in giving an incorrect jury instruction on self-defense; and (4) in preventing defendant from presenting evidence of the victim’s bad or violent character.
(1) In this claim, defendant asserts that the trial court erred in denying his challenge for cause as to prospective juror David Lee Oliver. La.C.Cr.P. art. 800 states that a defendant may not raise an assignment of error as to the denial of a challenge for cause made by him unless he objects at the time of the ruling, stating the nature of the objection and the grounds therefore. The State accepted Mr. Oliver but defendant challenged him for cause. The trial court initially said it was going to grant defendant’s challenge, stating that it thought “he had a hard time grappling with the issue and the doctrine of self-defense.” However, the court allowed the State the opportunity to rehabilitate Mr. Oliver, who said he agreed with the proposition of lawful self-defense if a person reasonably believes he is in imminent danger of receiving great bodily harm or death. The court inquired | ^further about Mr. Oliver’s view of the fact that multiple gunshots might have been fired:
THE COURT:
The issue of whether there be [sic] one gunshot or multiple gunshots, it that a factor that you could give consideration to?
JUROR OLIVER:
I could give consideration to [sic]. But the question, the way it was put was: Does it give you — the way I took it, the way he was asking was: Does it give you an assumption of difference. At that point when he’s asking me that, yes, just a number of multiple gunshots.
THE COURT:
So you think that if this were a case where there were multiple gunshots that would immediately — you would immediately say, “I can’t accept self-defense because there was more than one shot?”
JUROR OLIVER:
*18 No, just what my assumption would be.
THE COURT:
Does either side have any questions?
Mr. Milner?
MR. MILNER [for the State]:
I don’t have any
THE COURT:
Mr. Sauviac [for defendant]?
MR. SAUVIAC:
There was one point during examination out there where we talked about — you said, “Shoot him in the leg,” and I don’t remember all the other ins and outs. Is that something — how are you reconciling that to the issue of what the judge is saying about a general defense of self-defense or justifiable homicide? Is that something that there’s a distinction in your mind between [sic] or something that you have a dividing line?
JUROR OLIVER:
Not necessarily a dividing line. It’s just from what your explanation of what justifiable homicide was I agree with, but I don’t agree with — you would have to really prove to me that you could not get away from the |1flsituation and that the only way for you to escape death was to kill that person.
THE COURT:
And you would impose, Mr. Oliver, — you would impose a reasonable person standard and not necessarily your own if your own may be different than that?
JUROR OLIVER:
Right.
THE COURT:
You would impose just what a reasonable person, accepting a community standard on that would be?
JUROR OLIVER:
Yes. (emphasis added).
Defense counsel noted an unspecific objection. However, the colloquy was directed to ascertaining whether Mr. Oliver could impartially consider a claim of self-defense and apply the correct law. La. C.Cr.P. art. 797 sets forth the grounds for challenges for cause. One of those grounds is that the juror is not impartial, although an opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground to challenge a juror if he declares that he can render an impartial verdict “according to the law and evidence.” The whole point of the trial court reopening the voir dire of Mr. Oliver was to explore Mr. Oliver’s ability to be impartial and to apply the law of self-defense. Defense counsel’s objection was clearly directed to the impartiality of Mr. Oliver and his ability to apply the law of self-defense, and the objection preserved his right to raise this claim of error.
A defendant need show only two things in order to establish reversible error as to the denial of his challenge for cause: (1) that the defendant exhausted all of his peremptory challenges; and (2) that the trial court in fact erred in refusing to sustain the defendant’s challenge for cause. State v. Jacobs, 99-1659, p. 4 (La.16/29/01), 789 So.2d 1280, 1284. “No additional showing of prejudice is required.” State v. Gaines, 96-1850, p. 3 (La.App. 4 Cir. 1/29/97), 688 So.2d 679, 681.
Defendant used one of his peremptory challenges to strike Mr. Oliver after the trial court denied his challenge for cause. The record reflects that defendant exhausted his peremptory challenges before selection of the eighth juror. Twelve jurors and an alternate were eventually selected.
*19 Prospective juror Mr. Oliver told defense counsel, with respect the issue of self-defense, that “you would have to really prove to me that you could not get away from the situation and that the only way for you to escape death was to kill that person.” This response by Mr. Oliver clearly showed that he would require the defendant to bear the burden of proving that he acted in self-defense. However, it is well-settled that when a defendant asserts self-defense, the State has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. State v. Ross, 98-0288, pp. 10-11 (La.App. 4 Cir. 9/8/99), 743 So.2d 757, 763; State v. Byes, 97-1876, p. 8 (La.App. 4 Cir. 4/21/99), 735 So.2d 758, 764.
After Mr. Oliver made it clear that he would require defendant to bear the burden of proving that he acted in self-defense, the trial court’s last two questions simply ascertained that in holding defendant to this burden Mr. Oliver would impose a reasonable person standard. In other words, the trial court merely ascertained that Mr. Oliver would impose a reasonable person standard when he required defendant to prove that he acted in self-defense. The court then denied the challenge for cause. Under these circumstances, the trial court clearly erred in denying the challenge for cause.
| ^ There is merit to this part of defendant’s assignment of error. Defendant’s conviction and sentence must be reversed, and the case remanded for further proceedings.
(2) In the second part of this assignment of error, defendant asserts that the trial court erred in permitting the State to misstate the law on self-defense during voir dire. Defendant first claims that the trial court erred in permitting the State to misstate that there is an “implied duty to retreat” and a “duty to avoid conflict” during voir dire of the first panel of prospective jurors. The record does not reflect any objection by defendant to these statements by the State during questioning of the first panel of prospective jurors — the record contains only the parts of voir dire reflecting objections. Accordingly, this claim of error was not preserved for review. See La.C.Cr.P. art. 841(A).
Defendant next complains about comments made during the voir dire of the second panel of prospective jurors. In discussing the law of self-defense, the prosecutor said: “And that’s why I bring up, there is a duty to retreat. If you can avoid conflict then there is a duty to avoid that conflict and thereby save a life.” (Trial transcript, p. 14). Defendant objected, and the trial court said: “All right. Let’s proceed.” (Id). Defendant’s sole argument here is that the trial court erred in saying that the State “properly stated” the duty to retreat. The trial court did not make the “properly stated” comment about this statement by the prosecutor, but about a different comment that is discussed below. Therefore, there is no merit to this part of defendant’s argument.
The prosecutor also stated to the second panel of prospective jurors that:
MR. MILNER:
Thank you, your Honor.
|22And so it has to be absolutely necessary, as I explained, and the force must be reasonable. Okay? The force — you have to — in order for a self-defense to be valid it has to meet all of those elements.
If I could show you that it wasn’t reasonable or it wasn’t imminent or there wasn’t a threat of great bodily harm or there wasn’t a risk of death or I can show you that the force used by defendant didn’t equal the force that was necessary or I can show you *20 that he had an opportunity to avoid that extinguishment of life, if I can prove to you any one of those things and I’ve met my burden of proof beyond a reasonable doubt of second degree murder—
It’s an “or” thing. I don’t have to prove all of them. If I can prove any one those things to show that self-defense was not reasonable then self-defense doesn’t apply. But that is my burden.
MR. SAUVIAC:
I’m going to object, Judge. He’s got to prove beyond a reasonable doubt that it was not in self-defense.
THE COURT:
I can’t hear you.
MR. SAUVIAC:
He has to prove beyond a reasonable doubt that it was not in self-defense. He can’t pick and choose a few that he happens to prove. He has to prove the burden shifts fully, beyond a reasonable doubt.
THE COURT:
I think Mr. Milner stated that. He stated that the obligation was his to disprove at that point that one of the elements of self-defense did not, in fact, apply to this case. I think he’s properly stated it. Continue Mr. Mil-ner.
The prosecutor’s statement was improper only in one respect — when he said that to meet his burden he would only have to show that there was no threat of great bodily harm or there was no risk of death. The State could not meet its burden if it showed only that there was no risk of death to defendant, for the homicide could still be justifiable if there was risk of great bodily injury to him. However, the prosecutor’s comment during voir dire was not a jury instruction. U3The trial court instructed the jury at the close of the case. The verdict rendered in this case was surely unattributable to this comment or to the trial court’s failure to sustain defendant’s objection in part and correct the misstatement. Accordingly, any error in this regard was harmless beyond a reasonable doubt. State v. Snyder, 98-1078, p. 15 (La.4/14/99), 750 So.2d 832, 845 (to determine whether an error is harmless, the proper question is whether the guilty verdict actually rendered in this trial was surely unattributable to the error).
There is no merit this claim of error.
(3) Defendant next claims that the trial court erred by “refusing to clarify” the issue of retreat in its instructions to the jury. Defense counsel, quoting from a handbook on criminal law, asked the court to give the jury the following instruction:
“While a person does not necessarily have to retreat in order to plead self-defense, [sic] and failure to retreat. If retreat is available as one factor to consider it in determining whether the defendant’s belief of danger was reasonable.”
The trial court declined to give that instruction, stating that it was just a general statement. Defendant objected. This proposed instruction, as transcribed, is virtually unintelligible, and thus the trial court properly declined to give it. See La.C.Cr.P. art. 807 (“A requested special charge shall be given by the court- if it does not require qualification, limitation, or explanation, and it if it is wholly correct and pertinent.”).
Defendant also claims the trial court erred in refusing defendant’s request to clarify the instruction on self-defense and burdens of proof, including factors to be considered like excitement, confusion and the victim’s character. There is no *21 merit to this claim either. Defense counsel pointed out another part of his handbook on | ^criminal law. The trial court informed defense counsel that these matters were in the court’s standard instruction, mentioning that some factors to be considered when assessing self-defense were “the excitement and confusion of the occasion,” and the “defendant’s knowledge of the assailant’s dangerous character.” Defense counsel agreed that this instruction was “okay,” noting that it was simply in a different order than in his handbook.
There is no merit to this part of the assignment of error.
(4) In the last part of this assignment of error, defendant argues that the trial court erred in barring his introduction of evidence of the victim’s bad character, consisting of testimony from witnesses of incidents between defendant and the victim at work, the victim’s threatening behavior toward defendant there, and the victim’s rap sheet.
La. C.E. art. 404(B)(2) states in pertinent part:
(2) In the absence of evidence of hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim’s prior threats against the accused or the accused’s state of mind as the victim’s dangerous character is not admissible....
Thus, the threshold inquiry is whether the defendant presented evidence of “hostile demonstration or an overt act on the part of the victim.” Defendant cites this court’s decision in State v. Williams, 96-1587 (La.App. 4 Cir. 4/16/97), 698 So.2d 249, for the proposition that an overt act within the meaning of La. C.E. art. 404(B) is any act of the victim which manifests in the mind of a reasonable person a present intention on his part to kill or do great bodily harm. Defendant submitted that he met his burden by presenting evidence of the victim’s attack on defendant that morning and of an argument in the parking lot of the gas station before both Igfiinen entered. Defendant also points to testimony by a gas station store clerk that she heard a scuffle in the station immediately before she heard shots, and the testimony of the pathologist that the victim had a contact wound, which would be consistent with a shot being fired by defendant during a scuffle with the victim.
The evidence of the victim’s attack on defendant on the morning of the shooting would not suffice to establish the threshold requirement of La. C.E. art. 404(B) because it was not “at the time of the offense charged.” This court commented on the evidence necessary to meet the threshold requirement of La. C.E. art. 404(B) in State v. James, 95-1182 (La.App. 4 Cir. 6/5/96), 675 So.2d 1224, as follows:
The evidence tending to establish an overt act must be “appreciable.” State v. Lee, 331 So.2d 455, 459 (La.1975), original opinion reinstated on reh’g (La.1976). When appreciable evidence of the overt act is in the record, the trial court cannot infringe on the fact-finding function of the jury by disbelieving the defense testimony and thereby deny the accused a defense permitted him by law. Id. at 459.
A defendant’s unsupported, self-serving testimony which is sufficiently contradicted by other evidence does not constitute “appreciable evidence” of an overt act or hostile demonstration on the part of the victim. See State v. Carter, 490 So.2d 291, 294 (La.App. 4th Cir. 1986); State v. Hardeman, 467 So.2d 1163, 1171 (La.App. 2d Cir.1985).
95-1182, p. 4, 675 So.2d at 1227.
The testimony defendant points to as evidencing a scuffle immediately prior to the shooting does not establish an overt *22 act on the part of the victim. This evidence is just as consistent with the victim grappling with defendant after defendant either drew the gun on him, or drew the gun and fired a shot at him, without any prior immediate overt act by the victim. The single contact wound 12(jOnly evidences the victim’s contact with the barrel of defendant’s gun at the time defendant fired one of the two nonfatal shots. This leaves what defendant refers to as the “argument” in the parking lot. An argument is not an overt act. Defendant does not point to any overt act or hostile demonstration during the argument. Accordingly, defendant has failed to establish the threshold requirement of a hostile demonstration or overt act “at the time of the offense charged,” and thus it cannot be said that the trial court erred in barring the rap sheet and evidence of particular bad acts by the victim.
There is no merit to this last part of this assignment of error.

ASSIGNMENT OF ERROR NO. 3

In this last assignment of error, defendant argues that the trial court erred in denying his motion to suppress a 911 tape; in permitting the tape to be played for the jury; in refusing to give a limiting instruction on the use of the tape by the jury; and in allowing the tape to be played again during the State’s closing argument.
The 911 tape introduced in evidence and played for the jury consisted of three calls to police. Defendant only objected to the admissibility of the tape insofar as the second call, made by a person known only as “Kevin.” Kevin called very soon after the shooting. Kevin was in an obvious excited state throughout the duration of the two-minute call he made outside the Texaco store. He immediately gave the 911 operator the license plate number of a car, describing it as a white Cadillac. He then told the operator that someone in the ear shot someone dead “just for having words.” The operator asked Kevin whether someone had been shot in the Texaco gas station. Kevin replied in the affirmative, and said it was D/stupid and wrong of the guy.” He later said again that it was “wrong.” Kevin is heard yelling to someone that he is calling the police.
Defendant asserts that the 911 tape constituted inadmissible hearsay. The tape was hearsay. However, La. C.E. art. 803(2) provides that “[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition” is not excluded by the hearsay rule. This is the so-called “excited utterance” exception. This exception requires an occurrence or event sufficiently startling to render the declarant’s normal reflective thought process inoperative, so that the statement is a spontaneous reaction to the occurrence or event. State v. Dalton, 99-0902, pp. 3-4 (La.App. 4 Cir. 3/29/00), 759 So.2d 180, 182-183. In determining whether the declarant was under stress of an excited event, the time span between the event and the statement is considered the most important factor; the trial court must determine whether the interval between the event and the statement was of sufficient duration to permit a subsidence of emotional upset and a restoration of a reflective thought process. State v. Lee, 2001-2082, p. 12 (La.App. 4 Cir. 8/21/02), 826 So.2d 616, 626. Factors which may indicate that a statement was the result of reflective thought are evidence that the statement was self serving or made in response to an inquiry; expansion of the excited utterance beyond a description of the event and into past or future facts; and proof that, between the event and the statement, the declarant performed tasks requiring reflective thought process. State v. White, 2000-1740, p. 5 (La.App. 4 Cir. 11/21/01), 802 So.2d 869, 873.
*23 It is implicit that the one who makes the statement have perceived the event or condition about which the statement is made. Defendant cites U.S. V. Mitchell, 145 F.3d 572 (3d Cir.1998). The excited utterance exception to the hearsay rule set forth in Fed.R.Evid. 803(2) is identical to the excited utterance exception provided by La. C.E. art. 803(2). Mitchell involved the admissibility of an anonymous note found in a getaway car at 10:00 a.m., a mile away from the scene of a robbery that occurred between 9:00 a.m. and 9:15 a.m. The note described an “exchange” car that the alleged robbers entered after exiting (“ditching”) the getaway car. The husband of the exchange car’s registered owner was in that car when later stopped by police, and found to be in possession of cash believed to be from the robbery. The defendant appealed the trial court’s admission of the note as an excited utterance, arguing that there was no evidence that the person who wrote it personally perceived what the note described. The appellate court acknowledged that a party seeking to introduce an anonymous statement carries a burden heavier than where the declarant is identified to demonstrate the statement’s circumstantial trustworthiness “circumstantial evidence of the declarant’s personal perception must not be so scanty as to forfeit the ‘guarantees of trustworthiness’ which forms the hallmark of all exceptions to the hearsay rule.” 145 F.3d at 576, quoting Miller v. Keating, 754 F.2d 507, 511 (3d Cir.1985). The court in Mitchell found the record “devoid of circumstances indicating by a preponderance” that the author of the anonymous note actually saw the defendant change cars. The court also found no indication that the author of the note was under the stress of excitement when he or she wrote the note, nor evidence that the parking of the getaway car was a shocking or exciting event.
In the instant case, contrary to defen-dant’s arguments, the record furnishes sufficient circumstances indicating by a preponderance of the evidence that Kevin witnessed the shooting, that the shooting was a startling, shocking and exciting Invent, and that Kevin was under the stress of excitement for the two minutes he was on the telephone with the 911 operator. The police department “incident recall” log introduced in evidence shows that the 911 operator received the call from Kevin at 2:43 p.m. Omari Prince testified that he walked to the Texaco station at 2:35 p.m. to cash his income tax check, and was in line at the check-cashing booth at the time defendant fired the first shot at the victim. The victim was giving Ms. Battiste a ride to work and she hurried him along at the gas station because she had to be there by 3:00 p.m. Thus, the temporal proximity between Kevin’s call and the shooting was very close. Kevin said he was outside preparing to pump his gas when defendant “went into the gas station, opened the door, and start shootin’ the guy.” Kevin did not detail for the 911 operator how he saw the shooting, such as through the glass door of the store, and did not say what “words” were exchanged between the two men. However, it can be noted that defendant testified that while he was outside he could see his girlfriend Thea Williams and the victim inside of the store. Defendant claimed he had walked only -three steps into the store when he and the victim encountered each other. Finally, defendant claimed that the victim yelled at him across the gas station before the victim went inside the store.
These facts, along with other circumstances evidenced by Kevin’s statement, establish by a preponderance that Kevin witnessed the “words” between the victim and defendant and the shooting, certainly a startling event. His statement to the 911 operator clearly was one “relating” to that startling event. It is obvious that *24 Kevin immediately called police after the shooting while he was still outside, and while making an effort to remember the full license plate number of the vehicle in which defendant made his getaway, called 911. While part of the statement was in lanresponse to questions by the 911 operator, before being asked anything Kevin blurted out that the shooter just went in and shot the victim “just for having words.” He subsequently repeated the essence of this statement in response to questions by the operator. However, to the extent that any repetitious part of Kevin’s two-minute statement does not meet the test for an excited utterance because it was in response to an inquiry by the 911 operator, the admission of it was harmless error, as it was simply corroborative of and cumulative to the admissible part of the statement. See State v. Taylor, 2001-1638, p. 22. (La.1/14/03), 838 So.2d 729, 748 (admitting hearsay which is merely corroborative and cumulative of other properly introduced evidence is harmless).
Contrary to defendant’s argument, the 911 evidence was relevant and admissible, and its relevance was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. See La. C.E. arts. 401-403. Defendant claims the admission of this evidence for the truth of the matter asserted violates the Confrontation Clause of the Sixth Amendment. However, there is no violation of the Confrontation Clause when properly admitted excited utterances are introduced for the truth of the matter asserted. See State v. Robinson, 2000-2284 (La.1/12/01), 776 So.2d 431 (introduction of victim’s properly admitted excited utterance does not violate the Confrontation Clause even when it constitutes the only direct evidence that the defendant committed the offense, citing State v. Henderson, 362 So.2d 1358, 1361 (La.1978)). The trial court in the instant case was not required to give the jury any limiting instruction on the use of the 911 tape as defendant argues, and the prosecutor’s playing of the 911 tape was within the proper scope of closing argument. State v. Bridgewater, 2000-1529, p. 34 (La.1/15/02), 823 So.2d 877, 903-904, cert. denied, Bridgewater v. Louisiana, — U.S. -, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003).
There is no merit to this assignment of error.

CONCLUSION:

Since we have found the trial court erred in denying defendant’s challenge for cause as to prospective juror Mr. Oliver and that defendant thereafter exhausted his peremptory challenges, the defendant’s conviction and sentence must be reversed. The case is remanded to the trial court for further proceedings consistent with the views expressed herein.
REVERSED AND REMANDED.

. A violation of La. R.S. 14:25.

. State v. Taylor, unpub., 2001-1686 (La.App. 4 Cir. 9/5/01).

. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (where codefendant’s confession admitted at joint trial, and codefendant did not take the stand, defendant denied his constitutional right to confront his accuser).